[Civ. No. 30357.   Second Dist., Div. Two.   Apr. 20, 1967.]

ELSTER'S SALES, Plaintiff, Cross-defendant and Appellant, v. EL BODRERO HOTEL, INC., Defendant, Cross-complainant and Respondent; LLEWELLYN G. BODRERO et al., Defendants and Respondents.

Title, Tannenbaum and Kaplan and Benjamin L. Kaplan for Plaintiff, Cross-defendant and Appellant.

Pray, Price, Williams & Deatherage and William C. Price for Defendant, Cross-complainant and Respondent and for Defendants and Respondents.

FLEMING, J.—Elster's, the seller of restaurant equipment, sought to recover in rounded figures $13,000 from El Bodrero, the buyer, on a defaulted conditional sales contract. El Bodrero cross-complained for $2,500, contending that on repossession and resale of the equipment Elster's had realized a surplus above the amount of the debt El Bodrero owed under its contract. Judgment went for El Bodrero for $2,500 plus interest from the date of resale, and Elster's appeals.

In May 1961 Elster's had sold restaurant equipment under conditional sales contract to El Bodrero for $72,000. In July 1962 El Bodrero defaulted on its contract still owing $49,500, and in January 1963 Elster's repossessed the equipment. In February 1963 Elster's entered a new conditional sales contract with Growth Development for the sale of the repossessed equipment for $54,000 and paid a sales tax of $2,000, which on paper left it $2,500 ahead of the $49,500 owed it by El Bodrero. Had the resale of the equipment been completed according to the terms of the new contract both parties agree that the surplus of $2,500 would belong to El Bodrero.

But Growth Development, after making time payments of $4,000, likewise defaulted. Elster's again repossessed and in December 1963 again sold the equipment on conditional sales contract, this time to Jack Cherniss for $36,000. Elster's then sought a deficiency judgment against El Bodrero for $13,000 under the terms of their conditional sales contract: "Should Purchaser [El Bodrero] fail to pay said indebtedness . . . Seller may resell the property at public or private sale, and apply the proceeds, after deducting expenses and liens, to the payment of said amount due hereunder and pay to Purchaser the surplus, if any, or in case of a deficiency Purchaser agrees to pay Seller the same at once." El Bodrero cross-complained under the same contract for payment of the surplus of $2,500.

Elster's seeks to hold El Bodrero liable for the difference between the net amount realized for the equipment on its three sales and the amount of the original sales price.[1] El Bodrero claims it is entitled to collect the paper profit which resulted from the resale of the equipment to Growth Development. As seen by the parties, the controversy turns on whether liability of the parties to each other is determined by the purchase price promised by Growth Development, or by the net amount realized in the transaction by Elster's ($2,000 net cash payments plus $36,000 promised in the third sale). But as we see the transaction, neither of these alternatives fully recognizes the various possibilities which are inherent in the case.

To impose liability on the basis of a paper surplus, as the trial court did, would permit El Bodrero, the party in breach of contract, to turn a profit at Elster's expense on the latter's attempt to salvage the losses it faced as a consequence of El Bodrero's default. Such a result would undercut the policy of the law which requires a repossessing seller to resell at the best obtainable price on commercially reasonable terms. (Com. Code, §§ 2706, 9504; *McMillen* v. *Pippin,* 211 Cal.App.2d 674, 677 [27 Cal.Rptr. 590].) ■ This policy tends to protect a defaulting buyer from any greater loss by way of deficiency judgment than the market reasonably justifies and thereby promotes an orderly marketing of repossessed goods in competition with new goods of equal quality and discourages distress sales brought about by forced liquidation. Were we to adopt El Bodrero's theory that credit is equivalent to cash and promise to performance the present policy of the law might largely be frustrated. A repossessor who sold repossessed goods on credit at the best obtainable price and succeeded in creating a potential surplus would profit not at all if the second buyer paid in full, and might suffer a loss in the event the latter defaulted, for the repossessor would be re-

---

[1]At the time of the contract deficiency judgments were permitted for all types of conditional sales. Since 1963 deficiency judgments on conditional sales of consumer goods have been prohibited by Civ. Code, § 1812.5, but a repossessor must still account to the buyer for any surplus derived from the proceeds of the resale. (Civ. Code, § 1812.4) These provisions of the Civil Code are limited to retail installment contracts covering tangible chattels bought primarily for personal, family, or household purposes (Civ. Code, §§ 1802.6, 1802.5, 1802.1), a classification which obviously would not include restaurant equipment. Business equipment is still subject to the general provisions of the Commercial Code, which continue to permit deficiency judgments after repossession and resale. (Com. Code, § 9504.)

quired to reimburse the original defaulting buyer from his own pocket for unrealized paper profits. The seller would then have two losses, and the original defaulting buyer would end with a profit.

Faced with these possibilities a repossessor would have no incentive to sell on credit at a profit and assume the risk of potential liability as a guarantor of the new buyer's credit, when he could avoid the risk by selling for cash or selling on credit at no greater price than the amount of the defaulting buyer's debt. But an honest seller of repossessed goods would have no reliable way of knowing in advance whether a sale on credit would produce a paper surplus. It seems likely, therefore, that in any case where the defaulting buyer appeared to have built up an equity in the goods, the repossessing seller would sell exclusively for cash, and the habit of cash sales would tend to spill over to all resales after repossession. The prevalence of cash sales would accentuate a fluctuating market for the goods and make the equity of defaulting buyers vulnerable to tight money conditions. We conclude that any rule which would make a repossessor and reseller of goods a guarantor of a second buyer's credit would be prejudicial to the long-term interests of buyers and sellers alike.

On the other hand, to accept Elster's theory of continuing liability for a defaulting buyer until the repossessor has collected the full amount of the original debt, might consign a defaulting buyer whose goods have been resold on long-term credit to indefinite financial limbo. The defaulting buyer would remain subject to a contingent liability so long as the goods were not fully paid for, and he could have no way of knowing whether the second buyer, or a third, or a fourth, would honor his contract. To subject such a debtor to a contingent liability for an indefinite period after default would make it difficult for him to rebuild after adversity and secure other credit on reasonable terms in order to get back in business. The defaulting buyer is entitled to have his obligation fixed and determined within a reasonable time, and it would be clearly unjust to saddle him with the hazard of a third party's financial vicissitudes in addition to his own.

We conclude that El Bodrero's liability to Elster's for any deficiency was fixed and determined when Elster's negotiated its contract for the sale of the repossessed equipment to Growth Development. This arrangement was a sale, and Elster's accepted the promise of the new buyer to pay for the equipment at an agreed price, a price at which any defi-

ciency under the Elster's-El Bodrero contract should have been computed. For such purposes Elster's must be deemed to have assumed the risk of the new buyer's credit and to have substituted the promise to pay of the new buyer for the promise to pay of El Bodrero, then in default. Since there was no deficiency in the promised amounts under the resale, El Bodrero was relieved from any liability for a deficiency under its contract. Should the second buyer default and a further repossession and resale produce a deficit, Elster's would have its remedy from the deficiency against the second buyer, but not against the first, which had already been relieved from liability under its contract.

However, this is not to say that Elster's immediately became liable to account to El Bodrero for a present surplus. Such a ruling would make a repossessor a guarantor of the credit of a new buyer for the benefit of an original defaulting debtor, a guaranty which, as earlier pointed out, no repossessor is likely to risk. Rather, the resale should be considered one for the account of the defaulting debtor insofar as the right to surplus is concerned. If in fact Elster's collected in full, then a surplus would come into being for which it would be required to account to El Bodrero. Until that event took place, a surplus would not arise.

Under this ruling repossessors are encouraged to sell on credit in order to realize full value for the goods, both for their own benefit and that of their debtors, and debtors are quit of lingering uncertainty over deficiency judgments whose amounts do not become ascertainable within a reasonable period of time.

The judgment on the cross-complaint is reversed.

Roth, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied May 15, 1967, and the judgment was modified to read as printed above.