[Civ. No. 34218. Second Dist., Div. Four. May 20, 1970.]

B.K.K. COMPANY, Plaintiff, Cross-defendant and Respondent, v. ROBERT SCHULTZ, Defendant, Cross-complainant and Appellant; BEN KAZARIAN, JR., et al., Cross-defendants and Respondents.

## Counsel

Allen, Fasman & Janger and Jerome Janger for Defendant, Cross-complainant and Appellant.

Ball, Hunt, Hart & Brown and Stephen A. Cirillo for Plaintiff, Cross-defendants and Respondents.

## Opinion

FILES, P. J.—In January 1961 plaintiff leased to defendant Schultz a hog ranch, for a term expiring December 31, 1966. At the same time plaintiff sold to defendant, under a written sales contract, livestock and equipment for use on the ranch. In June 1964 defendant abandoned the ranch, taking with him all of the livestock and most of the equipment. On November 18, 1964, plaintiff commenced this action for damages for breach of the lease and sales agreement. The answer set forth several defenses and included a counterclaim for the value of a house trailer sold by defendant to plaintiff. Defendant also filed a cross-complaint against the plaintiff corporation, Ben K. Kazarian, Jr.,[1] and Ben K. Kazarian, Sr., seeking declaratory relief and an accounting with respect to a business, known as R & S Disposal Company, in which defendant allegedly had a one-third interest.

After a court trial, a judgment was entered June 3, 1968, in favor of

[1]The answer of Ben K. Kazarian, Jr., to the cross-complaint is not in the record. We have ordered the superior court file transmitted, and find it does contain the answer. Cross-defendant Ben K. Kazarian, Sr., also answered, but the record contains no reference to him thereafter.

plaintiff against defendant in the principal sum of $79,582 plus prejudgment interest amounting to $29,480. On the cross-complaint the court adjudged that defendant does not have any interest in the business and is not entitled to an accounting.

Defendant is appealing from that judgment.

### The Measure of Damages on the Lease

The lease called for rent at the rate of $400 per month for the full term of six years. It was admitted that only $6,800 had been paid, leaving a difference of $22,000. Immediately after defendant vacated the premises in June 1964 plaintiff employed Jesse Gomez, a former employee of defendant, to stay at the ranch, protect it, clean it up and make repairs. There is substantial evidence that defendant had left the premises in a run-down condition. The property was in a remote canyon and suitable only for a hog ranch, under a use permit issued by the county. On August 10, 1964, plaintiff's attorney wrote to defendant advising that plaintiff intended to hold him for the entire term of the lease. Again on September 22, 1965, plaintiff's attorney notified defendant in writing that plaintiff continued to hold defendant responsible, but would attempt to mitigate damages by reletting the property. Plaintiff then moved some hogs onto the ranch so that the use permit would not be lost. However, the county took the position that the use permit had already been terminated because of nonuse, and ordered the hogs removed. Thereafter there was no possibility of leasing or using the ranch profitably.

It was defendant's contention at the trial, and here, that by keeping Gomez on the premises plaintiff accepted the surrender and thereby waived all installments of rent falling due thereafter. However, the law has long recognized that a landlord who is forced to take possession of abandoned property to preserve it does not necessarily acquiesce in the surrender and termination of the lease. (See *Respini* v. *Porta* (1891) 89 Cal. 464 [26 P. 967].) In the case at bench there is evidence which supports the finding of the trial court that "Plaintiff did not accept the surrender of the leased premises by defendant."

The applicable law is stated in *De Hart* v. *Allen* (1945) 26 Cal.2d 829, 832 [161 P.2d 453]: "Where, as here, the premises have been abandoned the lessor may consider the lease as still in existence and sue for the unpaid installments of rent as they become due for the unexpired portion of the term, or he may retake possession for the lessee's account and relet the premises, holding the lessee for the difference between the rentals under the lease and what the lessor was able in good faith to procure by reletting."

(Accord: *Phillips-Hollman, Inc.* v. *Peerless Stages, Inc.* (1930) 210 Cal. 253, 258 [291 P. 178].)

■ Since plaintiff was unable to relet the premises for any portion of the term, the entire balance of the rent became the measure of its damage. The factual question whether the plaintiff accepted the surrender, or whether it held possession for defendant's account was fully litigated in the trial court. The trial court found that plaintiff did not accept the surrender. This determination, based upon a reasonable view of the evidence, supports this portion of the judgment.

■ Defendant points out that the complaint was filed in November 1964 before most of the damage had accrued. He points to some older decisions such as *Treff* v. *Gulko* (1932) 214 Cal. 591, 598 [7 P.2d 697], holding that a complaint which is filed before the damage accrues is premature, and that no recovery may be had for installments of rent falling due after the date of the complaint.[2] But this strict rule of procedure has now been abandoned. (See *Golden State etc. Life Ins. Co.* v. *Frankfurt* (1962) 210 Cal.App.2d 223, 227 [26 Cal.Rptr. 444].)

Modern case law regards prematurity of the action as ground for abatement only, and if there is no timely motion to abate, the defense is waived. (See 2 Witkin, Cal. Procedure (1954) Pleading, § 564, p. 1566.) Thus in *Moore* v. *Fellner* (1958) 50 Cal.2d 330, 343 [325 P.2d 857], the Supreme Court said: "However, the unfavored defense that the action was prematurely brought is simply matter of abatement which must be pleaded in proper time or it is waived. Further, if the defense has ceased to exist at the time defendant seeks to raise it, there is no occasion to consider whether it has been waived, as it may be disregarded."

■ The trial of this case took place in 1968, after all installments had become due, so that the court could properly include all of them in the judgment.

### Damages for Breach of the Sale Contract

The court allowed defendant an offset for the full amount claimed in his counterclaim for the value of a house trailer which he had sold to plaintiff. The correctness of this determination is not now challenged.

Defendant contends he did not receive proper credit for three items of personal property repossessed by plaintiff after the 1964 default. This calls

---

[2]Whether the *Treff* decision was correct, even as of the time it was decided, was questioned in *Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 31-32 [142 P.2d 22].

for an examination of the contract and the conduct of plaintiff following the default.

█ The simple typewritten agreement declares that "the seller does hereby agree to sell and conditionally convey" the described property. Despite the absence of much of the language usually found in a conditional sales contract, the parties appear to be in agreement that the seller contractually retained a security interest in the property. The price of the livestock was $42,655 and the price of each other item was separately stated, for a total of $67,000, payable on or before July 1, 1962, with interest at 6 percent from January 1, 1961. The buyer agreed not to convey or destroy any of the property, except livestock, without the consent of the seller. There was no statement of the remedies of the seller except this: "a. Any breach of this agreement, in any respect, shall give the buyer the privilege of considering this agreement terminated, and seller may demand full payment of the balance due at time of breach."

Although several of the items sold were motor vehicles, neither the parties nor the trial court ever suggested the applicability of Civil Code section 2981 et seq. For the purpose of review we therefore accept their assumption, without deciding, that these sections are inapplicable.

When defendant abandoned the ranch in June 1964 he left behind a 1960 Chevrolet truck, the contract price of which was $7,295, a 1949 International truck with a contract price of $2,500 and a garbage unloader with a contract price of $5,800.

No part of the $67,000 contract price, or any interest thereon, had been paid.

Ben K. Kazarian, Jr., one of the officers of plaintiff B.K.K. Company, testified that, after the default, the two trucks were taken to plaintiff's equipment yard in Torrance.

The body of the Chevrolet truck was sold for $1,000 and a rubbish truck body was put on. Thereafter that truck was used in a rubbish collection business owned by Kazarian. The ultimate disposition of the garbage unloader was not shown.

There was conflicting evidence as to the value of each of the three items at the time of default. The trial court found that at the time of repossession the value of the International truck was $1,200 and the value of the garbage unloader was $3,500. No finding was made as to the value of the Chevrolet, but the court did find "In 1966, plaintiff sold the body of the 1960 Chevrolet truck for the sum of $1,000.00."

Upon these findings the court allowed defendant credits of $1,200, $3,500 and $1,000 respectively against the contract price.

The classic statement of the remedies of the unpaid seller is found in *Johnson* v. *Kaeser* (1925) 196 Cal. 686, 694 [239 P. 324]: "It is settled by an unbroken line of decisions that, as to such a contract, it is optional with the seller, upon default by the purchaser in complying with any of the vital terms of the agreement, either to treat the contract as involving a conditional sale and retake possession of the property or ratify the contract as one involving an absolute sale of the property and so sue for the recovery of all moneys then payable thereunder. In other words, the seller in such case is vested with the right to exercise an election as between the two remedies suggested."

The two remedies are inconsistent alternatives, so that an election to pursue one of them bars the other. (See, e.g., *Smith* v. *Greenfield State Bank* (1963) 222 Cal.App.2d 869 [35 Cal.Rptr. 579] (probate claim for money bars repossession); *Martin Music Co.* v. *Robb* (1931) 115 Cal. App. 414, 419 [1 P.2d 1000] (bankruptcy claim for money bars action to repossess); *James* v. *Allen* (1937) 23 Cal.App.2d 205 [72 P.2d 570] (repossession bars action for money).)

The cases also recognize that the seller has a third alternative, that is, to repossess the goods, resell for the benefit of the defaulting buyer, and sue for the deficiency. (See, e.g., *Matteson* v. *Equitable Min. & Milling Co.* (1904) 143 Cal. 436 [77 P. 144]; *Kreisa* v. *Stoddard* (1954) 127 Cal. App.2d 627 [274 P.2d 164]; *Jeanson* v. *Zangl* (1932) 119 Cal.App. 692 [7 P.2d 314].)

No authority has been found in the decisions of this state which would allow the seller to retake the goods, retain them for his own use, and then sue for the difference between the contract price and what the court ultimately finds to have been the reasonable value as of the date of repossession. *Construction Machinery Co.* v. *Willard & Rodman, Inc.* (1962) 208 Cal. App.2d 31 [25 Cal.Rptr. 13] is persuasive authority that that alternative is not available. In the cited case the seller repossessed and then sued for the difference between the price and the value at the time of repossession. In reversing a judgment for the seller, the opinion points out that the evidence would support a finding that the seller did not intend an election when it repossessed, but then goes on to say this (at p. 39): "However, the right to recover a deficiency depended on sale of the goods within a reasonable time. Under the facts, there could not be and there was not, any finding on such subject. No right to recover a deficiency under the sale

terms of the contract had crystallized even at the time of trial. Under the contract, pleadings and the evidence, the court had no power to render a deficiency judgment against defendants."

In that case the contract expressly authorized the seller to repossess, resell, and recover the deficiency. In that respect it differs from the contract at bench, where there is no statement of the seller's remedies. ■ The third alternative remedy of repossess, resell and sue for deficiency may be available even where the contract is silent as to remedies (*Kreisa* v. *Stoddard, supra,* 127 Cal.App.2d 627). But where the contract is silent, we see no justification for a remedy which is broader than is allowed under the conventional contract which expressly provides for a deficiency.

In *Elster's Sales* v. *El Bodrero Hotel, Inc.* (1967) 250 Cal.App.2d 258 [58 Cal.Rptr. 492] the court pointed out that the policy of requiring prompt and diligent resale of repossessed property is an important protection for the defaulting buyer. (See also *McMillen* v. *Pippin* (1963) 211 Cal.App.2d 674, 677 [27 Cal.Rptr. 590].)

In the case at bench the findings establish that two of the three items repossessed had substantial value, and thus could have been sold for defendant's benefit had plaintiff elected to do so. The third item, the Chevrolet truck, obviously had value also, as it was taken by one of plaintiff's officers for use in his own business.

■ In the light of the history of the rules governing the remedies of an unpaid seller, we must conclude that the plaintiff is barred from recovering the price of the three items which were repossessed.[3] It will therefore be necessary to modify the judgment on the complaint by giving defendant credit for the contract price of the repossessed items, instead of the smaller amounts allowed by the trial court.

### The Cross-complaint

Although defendant took the lease in his individual name, the ranch was operated by a corporation called Canyon Feed & Rendering Company, whose stock was owned 75 percent by defendant and 25 percent by Jesse Reyes, who also operated a rubbish collection business in Wilmington.

---

[3]The cases include at least one other alternative. In *Burr* v. *Gardella* (1921) 53 Cal.App. 377 [200 P. 493] the appellate court held that the seller of a truck who repossessed it was entitled to recover the reasonable value of its use. The sale was an incident of a highway construction subcontract. After the subcontractor (buyer) defaulted, the prime contractor (seller) had to take back the truck and complete the job. The Supreme Court, in denying a rehearing, indicated (at p. 397) that the result was proper upon the ground that "That contract was forfeited and in effect rescinded." In the case at bench no comparable rescission is involved.

In the fall of 1962 Reyes received an invitation to bid on a contract with the Torrance School District for rubbish collection. Reyes discussed the prospect with defendant and one of them discussed it with Kazarian, Jr. The agreement arrived at is described in the following findings of the trial court: "In October, 1962, an oral agreement was entered into between Jesse Reyes, cross-complainant, ROBERT SCHULTZ, and cross-defendant, BEN KAZARIAN, JR. It was agreed that:

a. A bid would be made for the Torrance Unified School District contract in the name of Canyon Feed and Rendering Company.

b. If successful in the bidding, the parties would incorporate a company to be known as R&S Disposal Company which would assume the rights and obligations of Canyon Feed and Rendering Company under the contract with the Torrance Unified School District.

c. The assets and property of R&S Disposal Company would be owned by the parties, one-third each, and the net profits would be distributed to the parties in the same proportion.

d. The parties would each exercise reasonable efforts to organize and promote the business of R&S Disposal Company."

The Torrance contract was awarded to Canyon Feed, and performance of the collection business was commenced under the supervision of Reyes, who also continued to operate his own Wilmington rubbish collection business. To some extent the operations of the two were integrated. Although Reyes devoted all of his time thereafter to the rubbish collection business, he continued for some time to receive his salary from Canyon Feed. There is evidence that Canyon Feed paid other expenses of operating the rubbish collection business in the performance of the Torrance school contract. Kazarian, Jr., provided capital in the form of loans to R & S Disposal Company.

The articles of incorporation of R & S were filed January 9, 1963. At the first meeting of directors Kazarian, Jr., was elected president, Reyes vice president, and defendant secretary-treasurer. No stock was issued at this time.

In early 1964 Reyes decided he wanted to terminate his relationship with R & S. He and Kazarian, Jr., negotiated an agreement whereby Reyes' personal rubbish business was separated from the R & S business, and in consideration of the transfer of certain assets to him Reyes released R & S of all claims. This agreement was set forth in a written contract dated March 5, 1964, signed by Reyes and by "R & S Disposal Company Inc., a California corporation, by Ben K. Kazarian, Jr."

Defendant was aware of that agreement. On March 6, 1964, Reyes and defendant resigned as directors and officers of R & S, and the Torrance school contract was formally assigned by Canyon Feed to R & S.

On April 1, 1964, R & S changed its corporate name to Falcon Disposal Service, and in April 1965 the corporation issued 1,500 shares of its stock to Kazarian, Jr., in consideration of the cancellation of its indebtedness to him in the amount of $15,000. This was the only stock ever issued by that corporation.

██ One of defendant's contentions at the trial was that he and Kazarian, Jr., had orally agreed that defendant would surrender his interest in R & S in consideration of a release of all of his obligations under the hog ranch lease and sales agreement. The trial court found that no such agreement was made. This factual determination, based upon conflicting testimony, is conclusive here.

Defendant's cross-complaint asked, in the alternative, for an accounting and a declaration of rights with respect to his interest in the business of R & S Disposal Company. The trial court concluded that he was not entitled to either. There are no findings of fact from which we can discover any basis for that determination.

██ The trial court found, upon the evidence, that defendant, Reyes and Kazarian, Jr., had agreed to associate themselves to conduct a rubbish collecting business under the contract with the Torrance School District, each of the individuals to own one-third of the business and to receive one-third of the profits. Such an agreement, when carried out, makes the members joint venturers or partners with relation to each other. (See Corp. Code, § 15006; *Nelson* v. *Abraham* (1947) 29 Cal.2d 745, 749 [177 P.2d 931].) The fact that the parties contemplated the eventual use of the corporate form of business does not alter their status as joint venturers, as among themselves, pending the perfection of the corporate form of ownership. (See *Drdlik* v. *Ulrich* (1962) 203 Cal.App.2d 360, 365 [21 Cal. Rptr. 642]; *Morris* v. *Whittier Amusement Co.* (1932) 123 Cal.App. 121 [10 P.2d 1017].) The evidence and findings also show that the contract was obtained and the business of collecting rubbish was carried on. There is a conflict in the evidence as to what capital and services defendant contributed to the enterprise. The findings do not state with any precision what the parties agreed as to the contribution of each. It is evident that they never contemplated that all would contribute equal amounts of money and time. Reyes' contribution was largely in services. Kazarian's contribution was chiefly capital. There is substantial evidence, if believed by the trier of

the facts, that defendant individually, or through Canyon Feed, which he largely owned, contributed both promotional efforts and working capital for the new business. There is evidence that the business had assets and was a going concern, and that cross-defendant Kazarian, Jr., eventually came into full possession and control of it. There is no finding of any facts which would support any theory as to how defendant had been divested of the interest in the business which the parties had agreed to.

 The court found that on March 6, 1964, defendant resigned as an officer and director of the corporation, but this is not by itself a relinquishment of his proprietary interest.

The court also found that "Cross-complainant, ROBERT SCHULTZ, did not contribute equally with Reyes and cross-defendant, BEN KAZARIAN, JR., as agreed, of his time, money, credit, nor efforts. . . ." The most that can be derived from this negative pregnant is that Schultz in some way breached the agreement. But a breach of the partnership agreement does not necessarily result in a forfeiture of the partner's interest or deprive him of his right to an accounting. When a partner wrongfully withdraws he is entitled to the value of his interest, less the damages caused by him. (Corp. Code, § 15038.)

Defendant requested the trial court to make explicit findings as to the terms of the joint venture agreement, the performance of defendant under that agreement, the existence of any subsequent agreement among the parties, and the property owned by the business and the disposition of it. All those requests were refused. Without findings, this court has no way of determining whether defendant was refused an accounting on some proper factual ground, or whether it was upon some erroneous interpretation of the law. (See *Garber* v. *City of Los Angeles* (1964) 226 Cal.App.2d 349, 354-356 [38 Cal.Rptr. 157]; *29 Palms Van & Storage* v. *Los Angeles Met. Transit Authority* (1963) 221 Cal.App.2d 183, 186 [34 Cal.Rptr. 430].)

The judgment is reversed and the case is remanded to the superior court for further proceedings. The decision in favor of plaintiff on the complaint stands, except that for the three items repossessed defendant shall receive credit for the contract price of $15,595 instead of $5,700. Interest on the balance owing to plaintiff shall be recomputed to the date of judgment. On the cross-complaint the trial court shall make new findings of fact and conclusions of law determining the nature and extent of the interest, if any, of the defendant and cross-complainant in the business formerly conducted by R & S Disposal Company, and requiring an accounting with respect to such interest, if appropriate. If it is not practicable to make

appropriate findings on the present record there shall be a new trial on that portion of the cross-complaint which seeks to establish cross-complainant's interest in said business.

Kingsley, J., and Dunn, J., concurred.