[Civ. No. 44163. Second Dist., Div. Five. Feb. 21, 1975.]

J. T. JENKINS COMPANY, Plaintiff and Respondent, v.
TERRY KENNEDY, Defendant and Appellant.

## COUNSEL

Henry V. Cleary for Defendant and Appellant.

Spray, Gould & Bowers, and William R. Lowe for Plaintiff and Respondent.

## OPINION

**STEPHENS, Acting P. J.**—This is an appeal from a judgment entered in favor of plaintiff J. T. Jenkins Co. in the amount of $9,527.20 plus costs. Plaintiff is a distributor of Kenworth trucks; at the time in question, defendant Terry Kennedy, dba Kennedy Enterprises, was engaged in the business of operating a fleet of refrigerated trucks[1] throughout the United States. On March 1, 1966, plaintiff entered into a conditional sales contract with defendant for the sale of three new trucks and the refinancing of six trucks previously purchased.[2] Title to another

---

[1] These were large commercial trucks which had refrigeration units attached to trailers which attached to the trucks. The trucks, trailers, and refrigeration units (hereinafter, equipment) were purchased from three different companies.

[2] This transaction does not fall within the protection of either the Rees-Levering Motor Vehicle Sales and Finance Act (Civ. Code, §§ 2981-2984.3) or the Unruh Act (Civ. Code, § 1801 et seq.). The application of Rees-Levering is limited to the sale of a motor vehicle which is purchased primarily for personal or family use and not for business or commercial use. (Civ. Code, § 2981, subd. (j).) The Unruh Act precludes motor vehicles from coverage of the act. (Civ. Code, § 1802.1.) (See *Creditors Bureau* v. *De La Torre,* 16 Cal.App.3d 558, 562 [94 Cal.Rptr. 145]; *San Jose Autocar White Co.* v. *Williamson,* 249 Cal.App.2d 619, 621 [57 Cal.Rptr. 692].)

truck which was owned outright by defendant[3] was given as additional security under the contract.[4] The purchase price of the new trucks and the refinancing of the six previously purchased trucks totaled $200,703.13.[5] Defendant defaulted in his July and August instalments.[6] At the time of the default, there was a balance of $177,434.02 due on the contract.[7] Defendant arranged a meeting in late August with representatives of the three secured creditors, Julian White, the credit manager and vice-president of plaintiff corporation, Roy Whittaker, the credit manager of Utility Trailer Sales, Jack Bankman, the president of Thermo King Refrigeration Sales, and Richard Higbie, defendant's attorney, to discuss the reorganization of defendant's trucking enterprise into a corporate entity and the transfer of title of the equipment to the corporation to be formed.[8]

Higbie testified that as an alternative to reorganization under the bankruptcy laws, he suggested that plaintiff voluntarily repossess the trucks and have them stored at Utility Trailers; that the trucks would then be sold to the new corporate entity which would be formed; defendant would have 30 days from the date the last truck was turned in within which he could organize the new entity and repurchase the trucks. He further testified that the parties knew that it would take approximately 7 to 10 days to gather the trucks which were spread between Seattle and Los Angeles.

Kennedy similarly testified that the parties agreed that he should take the trucks to Utility Trailers; he should wait until he received from the

---

[3]The Rees-Levering Act would have precluded the inclusion of title to or a lien from any property other than the motor vehicle which is the subject of the conditional sales contract (Civ. Code, § 2984.2). (See *Thomas* v. *Wright,* 21 Cal.App.3d 921 [98 Cal.Rptr. 874]; *Brewer* v. *Home Owners Auto Finance Co.,* 10 Cal.App.3d 337 [89 Cal.Rptr. 231].)

[4]The contract provided in pertinent part: "The security interest created by this agreement . . . secures payment of any and all of borrower's indebtedness . . . including attorney fees, or other costs expended or incurred in connection with discovering, locating, or taking possession of said collateral, and all costs of towing, repairing, rehabilitating or storing of said collateral."

[5]The conditional sales contract recites that the total cash selling price of the trucks was $176,442.52; after deducting the down payment of $8,000, the finance charge of $24,260.61 was added; this left a total of $192,703.13 to be paid.

[6]Defendant had made a total of three payments on the contract. He did not pay until May the first instalment of $5,202.13 which had become due on April 15. He made the May instalment on time. His June instalment was returned for insufficient funds. He made a partial payment of $5,000 in July to cover the June payment, leaving $119 due on the June payment.

[7]The contract included an acceleration clause in the event of default.

[8]At the time of the meeting, there was at least one payment due to each of the creditors.

creditors formal notification of the sale; he would then have 30 days after the period set forth in the notice within which to pay the delinquent instalments and transfer title to the new corporation or refinance the contract. At the time of the agreement, the trucks were on the highways and it took approximately two weeks to deliver all of them to the place of deposit. The trucks were serviced before being returned. Kennedy further testified that the agreement was not put in writing; he described it as a "gentlemen's agreement."

Bankman also testified that the participants at the meeting (which was held in the latter part of the summer) agreed to give defendant a 30 day extension from the day of the meeting to reorganize his finances. Robert Jutzi, the controller of the plaintiff corporation at the time in question, testified that White (the credit manager) never mentioned anything to him about an extension having been granted to Kennedy. (White was deceased at the time of trial.)

On September 13, 1966, plaintiff sent a letter to Kennedy advising him that the trucks had been repossessed and taken from Utility Trailers to plaintiff's premises. The letter in pertinent part provided: "This is to advise that we will allow you a period of seven (7) days from the date of this letter in which to pay this account off in full. . . If this account has not been paid off within the period noted above; we will sell the units." An employee of defendant received the letter on September 15. At the time, defendant was in the east negotiating a contract with Ocean Spray to haul their products when he was informed of the letter. Kennedy testified that the Ocean Spray contract was one of the contingencies which would determine how to finance his business. He also testified that the letter did not disturb him because he felt it was "just a formality we discussed in our agreement." When he returned from the east, "which was right on the 7th Day . . . a Sunday evening," he phoned White at 10:30 to arrange a meeting to pick up the equipment. He told White that he had the money to pay the delinquent payments. White, however, informed him that the trucks had already been sold. "They've taken the matter out of my hands and they've sold your trucks." Jutzi gave the date of sale as September 23, 1966. Kennedy further testified that he attempted to contact Jenkins, the president of plaintiff corporation, but was unsuccessful. He was told by Jenkins' secretary that he had no chance of getting his equipment back and that plaintiff's general manager had threatened to quit if he did.

In order to clear title on the equipment so that it could be resold,[9] plaintiff was required to pay $6,200 to the State Board of Equalization for fuel taxes. Plaintiff sued defendant to recover the amount paid to the state. Defendant counterclaimed, alleging that there was an oral modification of the contract and that defendant had an equity of $60,000 in the repossessed equipment. The court granted plaintiff judgment for $6,200, together with costs and attorney fees. The court made no finding on defendant's counterclaim.

This appeal raises the issue of whether plaintiff is entitled to reimbursement for the fuel taxes it paid pursuant to Revenue and Taxation Code section 8651.[10] The contract specifically provided that the "Borrower agrees that all payments made by secured party for or on account of this security agreement or of collateral, by way of . . . *taxes* . . . repossession and return, shall be added to the amount due by borrower hereunder and become payable upon demand." (Italics added.) Since the sale in this case involves trucks used primarily for business or commercial purposes, it falls within the purview of division 9 of the California Uniform Commercial Code, section 9109.[11] ■ Section 9207, subdivision (2), provides that when collateral is in the secured party's possession,[12] "reasonable expenses (including . . . payment of taxes . . .) incurred in the custody, preservation, use or operation of the collateral are chargeable to the debtor and are secured by the collateral." Hence, section 9207, subdivision (2), gives plaintiff a statutory right to reimbursement for the $6,200. (Cf. *Elster's Sales* v. *El Bodrero Hotel, Inc.*, 250 Cal.App.2d 258, 259 [58 Cal.Rptr. 492].)

■ The question with which we are then faced is whether plaintiff had to comply with the requirements of California Uniform Commercial

[9]Section 8991 of the Revenue and Taxation Code imposes a lien on any motor vehicle on which the fuel tax has not been paid. Section 8995 provides that the registered ownership of any motor vehicle may not be transferred unless a certificate of excise tax clearance has been issued. The lien imposed by section 8991 is paramount to all private liens that may be on the motor vehicle. (§ 8994.)

[10]Revenue and Taxation Code, section 8651: "An excise tax is hereby imposed at the rate of seven cents ($0.07) for each gallon of fuel used, except that for the period commencing on June 1, 1969, to and including November 30, 1969, or such earlier date as may be established pursuant to Section 8651.4, the rate shall be eight cents ($0.08) for each gallon of fuel used."

[11]California Uniform Commercial Code, section 9109, subdivision (2) in pertinent part provides: "Goods are . . . (2) 'Equipment' if they are used or bought for use primarily in business (including farming or a profession)."

[12]California Uniform Commercial Code, section 9501, subdivision (1) in pertinent part provides: "A secured party in possession [after default] has the rights, remedies and duties provided in Section 9207."

Code section 9504, subdivision (3),[13] before the sale in order to be entitled to reimbursement under section 9207, subdivision (2).

At the outset, it must be noted that section 9207, subdivision (2), provides that the payment of taxes is chargeable to the debtor and is also secured by the collateral. Therefore, the $6,200 was secured by the trucks and should have been paid out of the proceeds of their sale.[14] As previously stated, a secured creditor in possession of collateral after default has the rights and remedies provided in section 9207. (§ 9501.) Since a secured party also has the rights and remedies provided by chapter 5 of article 9, which encompasses sections 9501 and 9504, subdivision (3), the term "reasonable expenses" used in section 9207 (which includes payment of taxes) must be viewed as being coextensive with the same term as used in section 9504, subdivision (1) (a), which gives priority to the payment of reasonable expenses upon sale of the collateral. Accordingly, the taxes should have been paid out of the proceeds, before the satisfaction of the underlying indebtedness. (§ 9504, subd. (1) (b).) Since Robert Jutzi, the secretary-treasurer of plaintiff corporation, testified that to the best of his knowledge the "other customer assumed the exact amount of the contract,"[15] plaintiff is

---

[13]California Uniform Commercial Code, section 9504, subdivision (3), in pertinent part provides: "A sale or lease of collateral may be as a unit or in parcels, at wholesale or retail and at any time and place and on any terms, provided the secured party acts in good faith and in a commercially reasonable manner. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the secured party must give to the debtor, and to any other person who has a security interest in the collateral and who has filed with the secured party a written request for notice giving his address, a notice in writing of the time and place of any public sale or of the time on or after which any private sale or other intended disposition is to be made. Such notice must be delivered personally or be deposited in the United States mail postage prepaid addressed to the debtor at his address as set forth in the financing statement or as set forth in the security agreement or at such other address as may have been furnished to the secured party in writing for this purpose, or, if no address has been so set forth or furnished, at his last known address, and to any other secured party at the address set forth in his request for notice, at least five days before the date fixed for any public sale or before the day on or after which any private sale or other disposition is to be made. Notice of the time and place of a public sale shall also be given at least five days before the date of sale by publication once in a newspaper of general circulation published in the county in which the sale is to be held. . . . Any sale of which notice is delivered or mailed and published as herein provided is a public sale."

[14]The taxes were required to be paid before the sale of the trucks in order to extinguish the lien imposed on the vehicles by Revenue and Taxation Code section 8991. Nevertheless, the $6,200 was still secured by the proceeds of the sale of the collateral. (Cal. U. Com. Code, § 9306.)

[15]Section 9504, subdivision (2), requires the secured party to account to the debtor for the surplus, if any, upon sale of the collateral after default. The contract contained a similar provision. It is well settled that it is the duty of the repossessing seller to obtain the best price possible under the circumstances prevailing at the time of resale. (*Elster's*

seeking a deficiency judgment in the amount of $6,200. In order for plaintiff to be allowed to recover the deficiency, it is necessary for plaintiff to have complied with the statutory requirements of section 9504, subdivision (3), concerning disposition and notice.

In *Barber* v. *LeRoy,* 40 Cal.App.3d 336, 341 [115 Cal.Rptr. 272], this court recently held that a party who fails to comply with section 9504, subdivision (3), by not giving the requisite notice of a proposed sale of collateral on the debtor's default, or who fails to conduct the sale in a commercially reasonable manner, will be barred from obtaining a deficiency judgment. (See also *Atlas Thrift Co.* v. *Horan,* 27 Cal.App.3d 999, 1009 [104 Cal.Rptr. 315, 59 A.L.R.3d 389]; Annot. 59 A.L.R.3d 401.) In *Barber,* it was also held that a secured party who conducts a sale of collateral must allege and prove compliance with the requirements of section 9504, subdivision (3), in his complaint as a prerequisite to recovering a deficiency judgment. In the instant case, plaintiff failed to satisfy the requirements of giving adequate notice of a public sale. Even if plaintiff had given adequate notice of a public sale, it still failed to allege and prove compliance with the notice requirements of section 9504, subdivision (3), in his complaint. Plaintiff alleged in his complaint, and the trial court found (finding of fact No. 4), that after giving notice the trucks were sold at a public sale. The contract contained a provision that upon default by the borrower, the secured party could remove and dispose of the collateral at "public or private sale after five (5) days' written notice to the borrower at the address [shown on the contract]." Similarly, section 9504, subdivision (3), requires that written notice of the time and place of public sale be transmitted to the debtor either by publishing the information in a newspaper of general circulation, by personal service, or by mail at least five days prior to the public sale. It also requires advertisement of the public sale in a newspaper of general circulation at least five days before the sale is to be conducted. While the letter dated September 13 which plaintiff sent to defendant was received by defendant's office on September 15—more than five days prior to the sale which was effectuated on September 23—the letter failed to provide the specific notice demanded by section 9504, subdivision (3). The letter merely stated that the collateral would be sold at the end of seven days from the date of the letter (Sept. 13) and that the collateral could be inspected at plaintiff's premises. The letter-notice failed to specify the exact time and date when the public sale would be conducted. While it did state that the collateral was on the premises for inspection, this was

---

*Sales* v. *El Bodrero Hotel, supra,* 250 Cal.App.2d 258; *McMillen* v. *Pippin,* 211 Cal.App.2d 674 [27 Cal.Rptr. 590].)

insufficient to inform defendant of the place *of sale.* Any notice which fails to explicitly set forth the exact date, time, and place of public sale is legally infirm. (See 3 Commercial Law (Cont. Ed. Bar) § 9.48, p. 479; Siegel, *Commercial Reasonableness in Sales of Collateral,* 49 L.A. Bar Bull., 9, 35.)

·Even if plaintiff had complied with section 9504, subdivision (3), notice requirements, plaintiff failed to allege or prove such compliance in his complaint (Code Civ. Proc., § 459.) Plaintiff merely made a conclusionary allegation in his complaint that "after giving defendants notice thereof, plaintiff sold said trucks at public sale." Finding of fact No. 4 merely reiterates what plaintiff alleged in his complaint. It is obvious, however, that plaintiff did not, in fact, conduct a "public sale" (in terms of having an auction), as he alleged in his complaint. (See 3 Commercial Law (Cont. Ed. Bar) § 6.24, p. 294.) Aside from the fact that finding of fact No. 4 is unsupported by the evidence, even if plaintiff had properly alleged that he conducted a private sale, and even though the letter complied with section 9504, subdivision (3) by informing defendant five days prior to the time on or after which a *private* sale would be conducted, plaintiff still failed to allege compliance in his complaint. (*Barber* v. *LeRoy, supra,* at p. 341.)

Thus the deficiency judgment awarded the plaintiff must be reversed.

### *The Counterclaim*

■ It is firmly established that findings of fact must be made on every material issue raised in the pleadings, including issues raised by affirmative defenses in the answer, and that a failure to do so constitutes reversible error. (Code Civ. Proc., § 632; Los Angeles Superior Court rule 232(e); *Edgar* v. *Hitch,* 46 Cal.2d 309, 312 [294 P.2d 3]; *Aero Bolt & Screw Co.* v. *Iaia,* 180 Cal.App.2d 728, 743 [5 Cal.Rptr. 53]; *Mason* v. *Ennes,* 172 Cal.App.2d 99, 104 [342 P.2d 79]; *Hicks* v. *Barnes,* 109 Cal.App.2d 859, 862 [241 P.2d 648]; *San Jose etc. Title Ins. Co.* v. *Elliott,* 108 Cal.App.2d 793, 801 [240 P.2d 41]; 4 Witkin, Cal. Procedure, § 337, p. 3139.) In his answer and by way of counterclaim in the instant case, defendant alleged that the parties had entered into an oral modification of the contract. The court, however, failed to make findings as to (1) whether the parties had entered into the alleged agreement at the meeting they held in late August; and (2) whether the agreement modified the contract.

Absent a waiver, as a matter of law there could not have been an oral modification of the contract in this case. The underlying contract here involved a sale of goods as that term is defined in California Uniform Commercial Code section 2105, subdivision (1).[16] Under section 2209, subdivision (2), an oral agreement must be fully executed on both sides in order to modify a written contract. This clearly was not the case here. Despite the fact that there could not have been an oral modification, however, this does not nullify the necessity of the trial court having to make findings on whether or not there was an agreement. The agreement might have been the basis for a claim of waiver. (§ 2209, subd. (4): "Although an attempt at modification . . . does not satisfy the requirements of subdivision (2) . . . it can operate as a waiver.") (See *Panno* v. *Russo,* 82 Cal.App.2d 408 [186 P.2d 452]; Cf. *Brewer* v. *Universal Credit Co.* 191 Miss. 183 [192 So. 902].) While defendant's pleading does not specifically raise the claim of waiver, it may be construed from the facts pleaded. (*Wade* v. *Markwell & Co.,* 118 Cal.App.2d 410, 419 [258 P.2d 497, 37 A.L.R.2d 1363]; 3 Witkin, Cal. Procedure, § 399, p. 2057 and § 945, p. 2525.) Consequently, the failure of the court to make adequate findings constitutes reversible error.[17]

### Rebate of Unearned Finance Charges

As an aid to the trier of fact on remand, we discuss an issue raised by defendant. (Code Civ. Proc., § 43.) There is a handwritten note on plaintiff's "Ledger" sheet (Exh. 5) which purportedly gives defendant a rebate of unearned finance charges totaling $17,687.34, leaving a balance due of $159,746.68. Thereafter, the sums of $8,000 (representing the initial down payment which Exh. 1 recites as having been paid) and the sum of $10,757.62 (for open book account, Exh. 6) were added, making the new total of $178,504.30. The $17,687.34 amount was a rebate of the unearned finance charges.[18] Applying the "sum of the digits" method to

---

[16]California Uniform Commercial Code, section 2105, subdivision (1): " 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid . . . ."

[17]We note that defendant and cross-complainant delivered the trucks in accordance with the agreement and after incurring such expenses as were necessary in servicing the vehicles.

[18](See *Atlas Thrift Co.* v. *Horan,* 27 Cal.App.3d 999, 1010 [104 Cal.Rptr. 315, 59 A.L.R.3d 389]; Cf. Civ. Code, § 2982, subd. (d); Civ. Code, § 1806.3, subd. (b); *General Motors Accept. Corp.* v. *Kyle,* 54 Cal.2d 101, 108 [4 Cal.Rptr. 496, 351 P.2d 768]; 40 Ops.Cal.Atty.Gen. 247 (1962).)

compute the amount of the unearned finance charge, we find that there was an error made in the computation.[19] Since the total amount of finance charges was $24,260.61, and since there were six payments due under the contract from April 15 up to the time of the default-sale on September 23, 1966, we must examine the finance charge schedule attached to Exhibit 1 in order to determine the correct amount of rebate. The schedule provides in pertinent part:

"1. 3 - 1966 Kenworths  $78,325.32
    Less Down Payment    8,000.00
                         $70,325.32  @ 4.5% F for 48 Mos.   $12,658.55
 2. 3 - 1965 Kenworths   $60,141.30  @ 4.0% F for 42 Mos.     8,419.78
 3. 1 - 1963 Kenworth    $ 7,763.18  @ 4.0% F for 14 Mos.       362.54
 4. 1 - 1962 Kenworth
    2 - 1964 Kenworths   $30,212.72  @ 4.0% F for 28 Mos.     2,819.74
                                     Total Finance Charge   $24,260.61"

Defendant was entitled to the following rebates on the items shown:

| Item | Amount |
|------|--------|
| 1. | $11,718.80 |
| 2. | 6,209.35 |
| 3. | 124.49 |
| 4. | 1,975.18 |
| Total: | $20,027.82 |

When the $17,687.34 amount which defendant was credited with is subtracted from the $20,027.82 shown above, it leaves a balance of $2,340.48 due defendant.

### Other Issues

Defendant also raises other issues which we need not reach because of our ruling. However, the parties on retrial should introduce documentary evidence as to the amount of the default-sale of the trucks and whether the down payment was in fact paid. Defendant may also be entitled to damages pursuant to California Uniform Commercial Code section 9507 for the secured party's failure to comply with the notice requirements. (Cf. *Atlas Thrift Co.* v. *Horan, supra.*)

---

[19](Cf. 40 Ops.Cal.Atty.Gen. 190 (1962).)

The judgment is reversed and the cause is remanded for further proceedings in accordance with the views expressed in this opinion.

Ashby, J., and Hastings, J., concurred.