[Civ. No. 43240. First Dist.. Div. Four. Mar. 30, 1979.]

WESTERN DECOR & FURNISHINGS INDUSTRIES, INC.,
Plaintiff, Cross-defendant and Appellant, v.
BANK OF AMERICA, Defendant, Cross-complainant and Appellant.

## COUNSEL

Seyranian & Seibert and Hal F. Seibert for Plaintiff, Cross-defendant and Appellant.

Severson, Werson, Berke & Melchior, Donald J. Querio, Edmund T. King II, William S. MacKay and Theodore Sachsman for Defendant, Cross-complainant and Appellant.

## OPINION

CALDECOTT, P. J.—Plaintiff Western Decor & Furnishings Industries, Inc. (hereinafter Western Decor) filed a complaint against defendant Bank of America National Trust and Savings Association (hereinafter Bank of America) alleging three causes of action: the first for conversion, the second for interference with business relationship, and the third for breach of contract. Bank of America answered the complaint and filed a cross-complaint alleging that Western Decor failed to pay on several promissory notes.

At trial by jury, the court granted Bank of America's motion for nonsuit as to causes of action II and III.

The jury returned its verdict in favor of Western Decor on the first cause of action awarding damages in the amount of $1. The jury also found in favor of Western Decor and against Bank of America on the cross-complaint.[1]

Each party filed a cost bill and each party moved to tax the opposing party's costs. The court granted Bank of America's motion to tax Western Decor's cost bill, but only as to the attorneys' fees, allowing the remainder of the costs to stand. The court granted Western Decor's motion to tax Bank of America's entire cost bill.

Both parties have appealed from the judgment.

---

[1]Two special interrogatories were submitted to the jury. The jury found [1] ". . . the Bank of America did collect and attempt to collect the accounts receivable of Western Decor & Furnishings Industries, Inc. in a commercially reasonable manner; [2] No, the Bank of America did not sell the inventory of Western Decor & Furnishings Industries, Inc. in good faith and in a commercially reasonable manner and in compliance with the California Commercial Code."

Prior to and during 1970, Western Decor received loans from Bank of America. However, in the latter part of the year, Bank of America declined to extend any further credit either through accounts receivable financing or through direct loans.

In December 1970, Western Decor was successful in obtaining accounts receivable financing through Morris Plan. According to the financing agreement, after Western Decor sold a product, Morris Plan would pay Western Decor 80 percent of the amount of invoice sent to the buyer. Morris Plan then had the responsibility of collecting the amount owed. Before commencing the financing program, Morris Plan requested Bank of America to sign a release of its security interest in Western Decor's accounts. On December 18, 1970, Bank of America signed a release.

On February 9, 1971, Western Decor and Bank of America executed a new security agreement which updated the existing security agreement. This was done primarily because the existing security agreement had predated both a merger and a name change on the part of Western Decor.

In June 1971, William Horne (hereinafter Horne), a loan officer at the Bank of America, formally notified Western Decor that it was in default in its indebtedness to Bank of America which totalled approximately $50,000.

On July 20, 1971, Bank of America proposed a consolidated lending plan which provided that Bank of America refinance all of Western Decor's indebtedness, including that which was owed to Morris Plan. The board of directors of Western Decor rejected the proposal.

Bank of America then decided to foreclose its security interest in Western Decor property. On July 26, 1971, Bank of America mailed a notice to 335 of the 356 account debtors, informing them of its security interest and of their duty to make payments to the Bank of America instead of Western Decor. Bank of America and Morris Plan had agreed that all monies collected by the Bank of America on overlapping accounts would be forwarded to Morris Plan. From the 335 accounts which had a face value of approximately $183,000, Bank of America and Morris Plan were able to collect only $12,347.46.[2]

---

[2] $8,000 of which was used to pay off Morris Plan and the remainder of which was used to reduce Western Decor's indebtedness to Bank of America.

In August 1971, Bank of America seized the inventory from the Western Decor premises and on August 16, 1971, published a notice of public sale with respect to the inventory. Most of the inventory was sold for a total of $1,951.03. That which remained was later sold privately raising the total sale to $2,805. Although Western Decor had notice of the public sale, it did not receive notice of the private sale. After the collateral was liquidated, Western Decor owed Bank of America a deficiency balance of $32,231.72.

I

*Bank of America Was Entitled as a*
*Matter of Law to Collect Directly*
*From Western Decor's Account Debtors*

In an instruction to the jury, the court stated it had determined as a matter of law that Bank of America had the right to notify each of the account receivable debtors in the manner it did on July 26, 1971. It is the contention of Western Decor the court erroneously relied on the Security Agreement executed on February 9, 1971,[3] and that no security interest in accounts receivable was granted in that agreement.

Western Decor contends that the February 9, 1971 agreement gave Bank of America only those rights it already had under the prior security agreement executed in 1967. Furthermore, that by signing a release of its security interest in accounts receivable on December 18, 1970, in favor of Morris Plan, Bank of America was without any security interest in accounts receivable on the date of the new security agreement. Since the new agreement did not provide for an increase in indebtedness to Bank of America, it lacked consideration to give Bank of America a security interest in accounts receivable.

It is Bank of America's contention that the release signed in favor of Morris Plan was only a partial release resulting in subordination of its security interest in the accounts against which Morris Plan had loaned money. Even if the release extinguished Bank of America's security interest, Bank of America contends the new security agreement grants a security interest in accounts receivable. No new advancement of funds is

---

[3]The security agreement was given by Western Decor to Bank of America to secure all indebtedness (which would include the three promissory notes, the subject of the cross-complaint) due from Western Decor to Bank of America.

necessary to support the new security agreement since a preexisting indebtedness is sufficient consideration.

California Uniform Commercial Code section 9203 states in pertinent part: "(1) . . . a security interest is not enforceable against the debtor . . . with respect to the collateral and does not attach unless (a) . . . the debtor has signed a security agreement which contains a description of the collateral . . . and (b) Value has been given; and (c) The debtor has rights in the collateral."[4]

California Uniform Commercial Code section 1201, subdivision (44), defines "value" in the following manner: a person gives value for rights if he acquires them as security for or in total or partial satisfaction of a preexisting claim.

■ There is no dispute that Western Decor was in debt to Bank of America on February 9, 1971. Western Decor's preexisting debt is sufficient consideration for the execution of the new security agreement.

■ Western Decor further contends that the February 9, 1971, agreement did not give the Bank of America a security interest in both the inventory and the accounts receivable. The security agreement expressly provides that Bank of America as the secured lender is granted a security interest in Western Decor's inventory and the proceeds thereof.

Western Decor contends that the phrase "proceeds thereof" was never intended to cover accounts receivable but instead, referred to insurance proceeds in case of any damage or theft of the inventory.

California Uniform Commercial Code section 9306, subdivision (1) defines "proceeds" as follows: " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds . . . . Money, checks, deposit accounts, and the like are 'cash proceeds.' All other proceeds are 'noncash proceeds.' "

---

[4]California Uniform Commercial Code section 11108 states that "[u]nless a change in law has clearly been made, the provisions of this code as amended by the Legislature at the 1973-74 Regular Session shall be deemed declaratory of the meaning of this code as it existed prior to January 1, 1976." This provision of section 9203 was found in former Commercial Code section 9204, the substance of which has not been changed. Unless otherwise stated, references to the California Uniform Commercial Code will reflect the present law.

Although we find no California case on point, the use of case law in other jurisdictions which have adopted, like California, the Uniform Commercial Code's definition of "proceeds," is appropriate.

The Supreme Court of Rhode Island stated in *Matthews* v. *Arctic Tire, Inc.* (1970) 106 R.I. 691 [262 A.2d 831, 833], that: "Proceeds . . . is whatever is received when the collateral (in this case the inventory) is sold. Accordingly, when respondent sold any of the collateral, it received cash or a right to payment at a future date—an account. Thus it is clear that accounts resulting from any sale of respondent's inventory are indeed proceeds . . . ." (See *Farnum* v. *J. C. Merrill, Inc.* (Me. 1970) 264 A.2d 150.)

Although the parties had a right to limit the broad statutory definition of proceeds, there was no expression in the new security agreement that a narrower interpretation of proceeds was to be used. Thus, we are bound by the statutory meaning, and hold that Bank of America, while obtaining a security interest in the inventory and proceeds thereof, was also granted a security interest in the accounts receivable.

■ Western Decor also asserts that only an assignee of accounts receivable may seek payment from the account debtor, citing California Uniform Commercial Code section 9502, subdivision (1), which states: "When so agreed and in any event on default the secured party is entitled to notify an account debtor or the obligor on an instrument to make payment to him whether or not the assignor was theretofore making collections on the collateral, and also to take control of any proceeds to which he is entitled under Section 9306." Western Decor claims that since Bank of America is a creditor and not an assignee, it cannot take the benefits of section 9502, subdivision (1), in reducing Western Decor's indebtedness. This theory that a distinction exists between an assignee of accounts receivable and a holder of a security interest in proceeds in the application of section 9502, subdivision (1), is erroneous.

The purpose of section 9502, subdivision (1) is to provide an alternative method for a secured party to foreclose a security interest in accounts receivable. There is a problem of realizing on collateral for accounts receivable, as opposed to tangible collateral, thus section 9502, subdivision (1) allows a creditor to collect directly from the account debtor without causing an interruption of the immediate debtor's business. A sale of the accounts receivable rather than a direct collection from the

account debtors would certainly result in a disruption of the debtor's business operations, an interference section 9502, subdivision (1) is attempting to avoid. Although the most prevalent kind of financing transaction is a loan secured by an assignment of accounts, there appears to be no reason to distinguish between a secured party who has a security interest in the accounts receivable and one who has an assignment.

■ Western Decor claims that the bank did not comply with the notice requirement of the agreement prior to making direct contact with the account debtors. Section 6 of the security agreement provides that "[a]ny notice of sale, disposition or other intended action by Secured Party sent to Debtor at least five (5) days prior to such action shall constitute reasonable notice to Debtor." Reading this sentence in context of section 6, we conclude it does not provide that every action taken by Bank of America must be preceded by a five-day notice to Western Decor.

Section 6 refers to the California Uniform Commercial Code in setting forth the rights and remedies of Bank of America upon default by Western Decor. If notice were required by the Commercial Code before a secured party could exercise its statutory rights, then Bank of America must give Western Decor a five-day notice. However, since there is no statutory obligation that Bank of America must provide Western Decor with notice before attempting to collect from the account debtors directly, it was proper for Bank of America to notify account debtors without first notifying Western Decor.

## II

### Bank of America Acted in a Commercially Reasonable Manner

■ In reviewing the judgment of the lower court, we operate under the presumption the judgment is correct. (*Walling* v. *Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58].) "[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

■ "*Where the evidence is in conflict, the appellate court will not disturb the verdict of the jury . . . .* The presumption being in favor of the

judgment . . . , the court must consider the evidence in the light *most favorable to the prevailing party,* giving him the benefit of *every reasonable inference,* and *resolving conflicts* in support of the judgment." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4236.)

California Uniform Commercial Code section 9502, subdivision (2) provides that a secured party who undertakes to collect from account debtors must proceed in a commercially reasonable manner.

Western Decor cites the following as reasons why Bank of America failed to act in a commercially reasonable manner: 1) on the date Bank of America sent out notice to accounts receivable, Western Decor was indebted to Bank of America for only $60,000 and yet Bank of America notified 335 accounts receivable which had a face value at $183,000; 2) Bank of America jeopardized the value of the accounts receivable by failing to take any action until 95 days after the initial notice was sent; 3) Bank of America refused to notify Western Decor of the success, or lack thereof, of its collection efforts.

In reviewing the evidence, however, we find that substantial evidence was presented to support the jury's finding that Bank of America acted in a commercially reasonable manner in collecting from the account debtors.

The record is replete with testimony that Bank of America organized an active collection program. After the initial notice of July 26, 1971, was sent, each account receivable was separated into one of 14 categories created for the purpose of determining the extent of pursuit necessary to receive the collection. Depending upon the category into which an account receivable was placed, Bank of America would either send another letter or call the account debtor. Of course, some accounts receivable were not notified a second time for they had been categorized as "notice return unable to locate," "Accounts paid prior to July 26, 1971," etc. Other account debtors indicated to Bank of America that they had never received merchandise from Western Decor, or that if they had, it was returned.

We recognize there was a division of collection efforts between Bank of America and Morris Plan shortly after the notices were sent out. The purpose was to allow Morris Plan to supervise collection with respect to the accounts in which it had a security interest, while Bank of America

handled the remaining accounts. If there was any inactivity on the part of Bank of America, it appears to have been only with the accounts it agreed to let Morris Plan supervise and only until Morris Plan had been paid in full the amount Western Decor owed.

Although the face value of the 335 accounts receivable which received a notice from Bank of America was $183,000, there was substantial evidence to show that the value was inflated. Several of the account debtors had already paid prior to the sending of the notice, while others disputed they were at all indebted to Western Decor. As stated previously, some accounts had never received merchandise from Western Decor or returned it if they did.

In addition, the audit of Western Decor showed that as of April 30, 1971, the value of the accounts receivable was overstated in Western Decor's books. The books showed the value to be worth approximately $238,000. The auditor testified that the value instead was $190,635.98, since several accounts receivable had already been paid. The auditor further testified that, as a reserve for doubtful accounts, an additional deduction of $165,449.54 was to be made. Consequently, the total value of all accounts receivable as of April 30, 1971, was approximately $35,000. We recognize that the accounts receivable Bank of America sent notice to may not have been identical to those which were subject to the audit, however, we are satisfied that there was no impropriety in Bank of America's attempt to contact less than all of Western Decor's accounts receivable on July 26, 1971.

Although it is Western Decor who asserts Bank of America failed to behave in a commercially reasonable manner by refusing to send to Western Decor responses from account debtors who disputed the debt, the converse seems to be more accurate. Western Decor's collection expert testified that in order to have a successful collection program, it is often necessary to have an invoice, delivery slip or other supporting records from the immediate debtor to establish that the account receivable is valid. On two separate occasions, Bank of America requested Western Decor to provide it with supporting records since several account debtors responded that unless they receive evidence of the debt, they would not pay. Western Decor failed to do so. Bank of America was under no duty to keep Western Decor informed of its collection efforts. Rather, it was Western Decor's obligation to provide the necessary supporting records to Bank of America.

## III

### *A Deficiency Judgment*

Bank of America's cross-complaint sought to recover the deficiency balance due on three promissory notes. California Uniform Commercial Code section 9504 provides that in the event of default by the debtor the secured party may liquidate the security and apply the proceeds to the unpaid balance of the debt. If there remains a deficiency, the debtor is liable for the balance. Subdivision (3) of section 9504 imposes upon the secured party the duty to conduct the sale of the collateral in a commercially reasonable manner and to provide timely notice of the sale to the debtor.

If the secured party fails to give timely notice to the debtor or to conduct a commercially reasonable sale, the debtor may recover the loss caused by the secured party's failure to comply with the provisions of section 9504, subdivision (3). (Cal. U. Com. Code, § 9507, subd. (1).)

The California Uniform Commercial Code is silent with regard to the secured party's rights to collect a deficiency judgment in the event the secured party fails to comply with the provisions of section 9504, subdivision (3).

Authorities are in conflict as to the intent of the Uniform Commercial Code. One line of reasoning holds that failure of the secured party to comply with the notice requirement or the requirement to conduct the sale in a commercially reasonable manner bars the secured party from recovering a deficiency judgment. (*Turk* v. *St. Petersburg Bank & Trust Co.* (Fla.App. 1973) 281 So.2d 534; *Braswell* v. *American National Bank* (1968) 117 Ga.App. 699 [161 S.E.2d 420]; *Twin Bridges Truck City, Inc.* v. *Halling* (Iowa 1973) 205 N.W.2d 736; *Camden Nat. Bank* v. *St. Clair* (Me. 1973) 309 A.2d 329; *Bank of Gering* v. *Glover* (1974) 192 Neb. 575 [223 N.W.2d 56]; *Aimonetto* v. *Keepes* (Wyo. 1972) 501 P.2d 1017.) The rationale appears to be that without notice the debtor is deprived of regaining possession of the collateral by payment of the amount owed which would result in eliminating the deficiency. Under such circumstances, the creditor should not be allowed to recover a deficiency judgment. (*Braswell* v. *American National Bank, supra,* 117 Ga.App. 699 [161 S.E.2d 420].)

The other line of authority holds that the secured party's failure to comply with the provisions of section 9504, subdivision (3) does not result in a forfeiture of the right to recover a deficiency judgment. (*Universal C.I.T. Credit Co.* v. *Rone* (1970) 248 Ark. 665 [453 S.W.2d 37, 7 U.C.C.Rep. 847]; *Community Manage. Ass'n. of Colorado SP.* v. *Tousley* (1973) 32 Colo.App. 33 [505 P.2d 1314]; *Rushton* v. *Shea* (D.Del. 1976) 423 F.Supp. 468; *General Foods Corporation* v. *Hall* (1976) 39 Ill.App.3d 147 [349 N.E.2d 573]; *Levers* v. *Rio King Land & Inv. Co.* (1977) 93 Nev. 95 [560 P.2d 917]; *Conti Causeway Ford* v. *Jarossy* (1971) 114 N.J.Super. 382 [276 A.2d 402], affd. 288 A.2d 872; *United States* v. *Whitehouse Plastics* (5th Cir. 1974) 501 F.2d 692, cert. den. 421 U.S. 912 [43 L.Ed.2d 7, 95 S.Ct. 1566]; *Grant County Tractor Co., Inc.* v. *Nuss* (1972) 6 Wn.App. 866 [496 P.2d 966, 10 U.C.C.Rep. 1104].) In such cases, however, there is a presumption that the value of the security is equal to the amount of the debt. The second party may overcome the presumption by proving that the collateral was worth less than the total debt. (*Community Manage. Ass'n. of Colorado SP.* v. *Tousley, supra,* 505 P.2d 1314; *General Foods Corporation* v. *Hall, supra,* 39 Ill.App.3d 147 [349 N.E.2d 573]; *Conti Causeway Ford* v. *Jarossy, supra,* 114 N.J.Super. 382 [276 A.2d 402]; *Universal C.I.T. Credit Co.* v. *Rone, supra,* 248 Ark. 665 [453 S.W.2d 37, 7 U.C.C.Rep. 847].)

In some jurisdictions in which the recovery of a deficiency judgment is not barred, the deficiency judgment recovered by a secured party who has failed to give notice of the sale of the security is subject to a credit or setoff for damages to which the debtor is entitled pursuant to section 9507, subdivision (1). (*Conti Causeway Ford* v. *Jarossy, supra,* 114 N.J.Super. 382 [276 A.2d 402]; *Tauber* v. *Johnson* (1972) 8 Ill.App.3d 789 [291 N.E.2d 180]; *Grant County Tractor Co., Inc.* v. *Nuss, supra,* 6 Wn.App. 866 [496 P.2d 966, 10 U.C.C.Rep. 1104].)

A trend has been established in California to bar a deficiency judgment if the secured party fails to comply with the requirements of section 9504, subdivision (3). (*Credit Bureau Metro, Inc.* v. *Mims* (1975) 45 Cal.App.3d Supp. 12 [119 Cal.Rptr. 622]; *J. T. Jenkins Co.* v. *Kennedy* (1975) 45 Cal.App.3d 474 [119 Cal.Rptr. 578]; *Barber* v. *LeRoy* (1974) 40 Cal.App.3d 336 [115 Cal.Rptr. 272]; *Atlas Thrift Co.* v. *Horan* (1972) 27 Cal.App.3d 999 [104 Cal.Rptr. 315].)

In the case of *Atlas Thrift Co.* v. *Horan, supra,* 27 Cal.App.3d 999, the court applied the "no deficiency judgment" rule to the creditor who reclaimed the debtor's property from the debtor's bankruptcy trustee and

then "sold" the collateral to itself at public "sale" in its own office. The notice requirement of section 9504, subdivision (3) was violated in that neither the debtor nor his partner received notice personally or by mail.

█ In the present case the bank failed to give notice to Western Decor of the second sale or to conduct the sale in a commercially reasonable manner. In the light of the California cases, cited above, we see no reason to depart from the trend already established in California barring a deficiency judgment if the secured party fails to comply with the requirements of California Uniform Commercial Code section 9504, subdivision (3).

## IV

### *Nominal Damages*

█ Western Decor contends that an award of only nominal damages was error. Where the sufficiency of the evidence is challenged, we are guided by the aforementioned rules stated in the discussion of the second issue.

The jury was instructed that Western Decor's debt is extinguished if Bank of America did not conduct the sale of the inventory in a commercially reasonable manner and did not provide notice to Western Decor of the sale. The jury was further instructed that under such circumstances, Bank of America is liable for the difference between the sale price and the reasonable value of the inventory. In light of the instructions, the jury found for Western Decor since Bank of America had failed to provide Western Decor with notice of the second inventory sale. By awarding $1 in damages the jury in effect found that Western Decor suffered no damages despite Bank of America's noncompliance with the notice requirement.

There is sufficient evidence that although the book value of the inventory was $260,000 as of April 30, 1971, when Western Decor was audited, the true value was substantially less. The auditor testified that the book value was overstated by $86,000. There was testimony to the effect that much of the inventory was removed from the premises of Western Decor immediately before the inventory was repossessed. Entered into evidence is a seven-page list of the inventory which was repossessed and subject to the two sales. The jury was able to scrutinize the list and make its own determination as to the value of each item. The

jury's verdict demonstrates that it concluded the amount of money Bank of America received from the two sales was the reasonable value of the inventory. We find no reason to disturb the verdict.

## V

### Punitive Damages

The court granted a nonsuit as to the "punitive damages cause of action" on the ground that the cause had not been established. Western Decor submitted several proposed instructions on punitive damages all of which were refused by the court. The jury was not instructed on the subject.

██ Punitive damages are not in themselves a cause of action and are not subject to nonsuit. ██ However, the issue before this court on appeal is whether the trial court erred in refusing to instruct the jury on punitive damages. ██ A party is entitled to have the jury instructed on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may properly be drawn from the evidence. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 192, p. 3012.)

██ In order for the jury to award exemplary damages, there must be proof of malice in fact. Malice cannot be implied. (*Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 713 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) "The malice essential to an award of exemplary damages requires an evil motive or intent [citations omitted]; it ' "denotes ill will on the part of the defendant, or his desire to do harm for the mere satisfaction of doing it" ' [citations omitted]. Essential to any award of exemplary damages is a finding that the plaintiff was subjected to 'cruel and unjust hardship' by the defendant. [Citation omitted.] And in any case, the evil motive and desire to harm the plaintiff must be attended by ' "outrageous conduct." ' [Citations omitted.]" (*Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 771-772 [140 Cal.Rptr. 388].)

██ The evidence in support of punitive damages, as summarized by Western Decor in its brief, related to the collection of the accounts receivable.[5] This evidence, considered in the light most favorable to

---

[5]Western Decor also raised a point about a request by Horne that Western Decor hire a person by the name of Gallegos, a Mexican national. A work permit could not be obtained for Mr. Gallegos and Western Decor refused to hire him. This apparently took place in 1970 or early 1971.

Western Decor, does not approach the requirements for punitive damages set out in *Toole* and *Henderson.* The trial judge properly refused the proposed instruction. Furthermore, we note that the jury specifically found in answer to the special interrogatory proposed by Western Decor, that the bank, in the collection and attempt to collect the accounts receivable, had acted in a commercially reasonable manner, which is the manner provided for in the California Uniform Commercial Code. The jury could not have found that Bank of America's action was in compliance with the code and then have awarded punitive damages.

## VI

### *Attorneys' Fees*

Bank of America filed a cross-complaint alleging nonpayment of certain promissory notes. Each note contained the provision, "In event of commencement of suit to enforce payment of this note, the undersigned agrees to pay such additional sum as attorney fees as the court may adjudge reasonable." The "undersigned" was Western Decor. Bank of America, by filing the cross-complaint, commenced suit to enforce payment of the note. By the wording of this provision only the borrower, Western Decor, would be liable for attorneys' fees. However, Civil Code section 1717 provides that the prevailing party, whether he is the party specified in the contract or not, shall be entitled to reasonable attorneys' fees. The section further provides: "As used in this section 'prevailing party' means the party in whose favor final judgment is rendered."

From the wording of the judgment attorneys' fees were allowed on the cross-complaint only and then later disallowed. Western Decor contends it is entitled to attorneys' fees on the cross-complaint as it is the prevailing party and was also prevailing party on the complaint. Bank of America contends that as it had to file a compulsory cross-complaint[6] Western Decor's success on its own complaint is a prerequisite to recovery of fees, citing *Schrader* v. *Neville* (1949) 34 Cal.2d 112 [207 P.2d 1057]. *Schrader*

---

[6]A defendant against whom a complaint is filed must allege a "related cause of action" by cross-complaint or lose it. (Code Civ. Proc., § 426.30, subd. (a).) A related cause of action is a cause of action that arises out of the same transaction or series of transactions as the cause of action. (Code Civ. Proc., § 426.10, subd. (c).) Here, the complaint alleged that Bank of America improperly collected accounts receivable that had been pledged as security for certain notes. The cross-complaint seeks to recover the balance due on those same notes. The complaint and cross-complaint are based on the same series of transactions, thus the cross-complaint had to be filed in this action or would have been lost.

involved an automobile collision in which Schrader sued Neville and Neville filed a cross-complaint against Schrader. Judgment was rendered in favor of defendant on the cross-complaint. Schrader was allowed his costs and Neville appealed that order. The Supreme Court held that the net result of a judgment that awards nothing to the plaintiff is favorable to the defendant and that defendant is the prevailing party.

In the case at bar, Western Decor did not receive the damages it sought but it did receive a judgment in its favor on the complaint and Western Decor's recovery exceeded that of the defendant cross-complainant. Bank of America contends that a party recovering nominal damages has not prevailed and cites three cases in support of this contention. The cases cited are not in point and we have not been cited to any case holding a party receiving nominal damages is not a prevailing party. Western Decor is entitled to attorneys' fees on the cross-complaint.

The judgment is reversed, but there is no need for a retrial except to determine the amount of a reasonable attorneys' fee on the cross-complaint.

The judgment is reversed with directions that the trial court determine the amount of a reasonable attorneys' fee.

Plaintiff to recover costs on appeal.

Rattigan, J., and Christian, J., concurred.