**PERSONAL JET, INC., et al.,
Plaintiffs-Appellees,**

v.

**N. D. CALLIHAN, Defendant-Appellant.**

**N. D. CALLIHAN, Plaintiff-Appellant,**

v.

**PARIS JET, INC., et al.,
Defendants-Appellees.**

No. 78–2907.

United States Court of Appeals,
Fifth Circuit.

Aug. 20, 1980.

Wayne H. Paris, Houston, Tex., for defendant-appellant.

Diamond & Johnson, J. W. Johnson, Houston, Tex., for plaintiffs-appellees.

Before THORNBERRY, ANDERSON and THOMAS A. CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal arises out of the issuance of a permanent injunction against N. D. Callihan, enjoining him from levying execution against four aircraft and other property owned by Personal Jet, Inc. The United States District Court for the Southern District of Texas adopted the Magistrate's Report and Recommendation which concluded that (1) Paris Jet, Inc. and Aviation Research Corporation were not rendered insolvent upon making a conveyance of certain aircraft and other property on June 6, 1975, (2) Paris Jet, Inc. and Aviation Research Corp. received fair consideration upon the conveyance of certain aircraft and other property on June 6, 1975, (3) similarity of ownership in Paris Jet, Inc. and Personal Jet, Inc., through its parent Industrial Marketing Advisors, Inc. did not constitute fraudulent intent that would invalidate certain conveyances, and (4) the issues in this case are governed by the Uniform Commercial Code of California. Appellant claims that each of these conclusions constitutes error. We disagree and affirm the decision of the district court.

In 1973, Paris Jet, Inc. was formed by L. B. Pete (24.5% ownership), Arthur L. Sikking, Jr. (24.5% ownership), and Morgan Hetrick (51% ownership) for the purpose of purchasing Paris jets[1] in Europe and selling them in the United States. Aviation Research Corporation (ARC), a wholly owned subsidiary of Paris Jet, was formed for the purpose of refurbishing and remodeling the Paris jets.

Paris Jet entered into an agreement with Callihan in which he was to locate and purchase Paris jets for a commission of $3,000.00 per plane. While Callihan purchased seven planes for Paris Jet, he was only paid $6,000.00 of the agreed $21,000.00. Callihan brought suit as CA No. 75–H–223 in the Southern District of Texas in February 1975 for $15,000.00 (5 planes at $3,000) in commissions as well as $1,200.00 for his expenses. Because Sam Graves had acquired the stock of Hetrick, the suit was filed against Paris Jet, ARC, Hetrick, Sikking, Pete, and Graves. Callihan settled with Sikking and Pete so they were dismissed with prejudice. Callihan obtained a default judgment against the other defendants.

Callihan filed suit to enforce the judgment against the planes he had acquired for Paris Jet but found that the planes were no longer registered to them. He determined that four of the Paris jets were in San Antonio undergoing maintenance or remodeling. Three of these planes had been repossessed by Commercial and Farmers National Bank. They had then been transferred to Industrial Marketing Advisors (IMA).[2] IMA transferred the three planes to Personal Jet, Inc. and Personal Jet transferred one plane to Gilbert L. Marhoefer and Benjamin E. McKinney. The fourth plane was transferred directly from ARC to IMA and then to Personal Jet. Callihan contends that these transfers were without fair consideration, were made by an insolvent party, and were fraudulent. If he was able to set aside the conveyances, title would be revested to Paris Jet and the aircraft would constitute assets subject to execution of his default judgment. Relying on the argument that the conveyances could by set aside, Callihan procured a writ of execution and the four aircraft were seized by the U.S. Marshal in San Antonio. The record owners of the planes sought and

---

1. A Paris jet is a twin engine jet manufactured in France by Moraine-Saulnier until the early 1960's. It was designed primarily as a military training plane.

2. IMA is wholly owned by Sikking. IMA is the sole owner of Personal Jet, Inc.

obtained an order staying execution of the judgment.

The following consists of a review of the financial background of the four planes. ARC is a California corporation with its main office in Oxnard, California. ARC established a line of credit with Commercial and Farmers National Bank (Bank) in the amount of $250,000.00. This debt was guaranteed by Paris Jet and its stockholders. Various loans were made and security agreements were executed on two of the aircraft. A third plane was sold and the proceeds were used to pay off the debt. ARC was granted another loan of $250,000.00 to purchase two more Paris jets. The note was executed on November 7, 1974, and was again secured by the same two planes until the new planes could be brought to the United States and substituted as collateral. These arrangements were embodied in a letter that was recorded with the FAA.

The note was not paid by ARC in a timely manner so Bank filed suit on the note in March 1975 against ARC and the guarantors. The bank obtained a writ of attachment in May 1975, but did not enforce it. Negotiations between Bank, ARC, and Paris Jet resulted in Bank forbearing seizure of the planes in exchange for the pledging of additional collateral. ARC and Paris Jet agreed to give Bank security interests in the business assets of ARC including five planes, two of which were still located in the Netherlands. The other three planes, located in Oxnard, were not operable. A security agreement was executed on June 6, 1975, and financing statements were filed. Security agreements were filed with the FAA on June 27, 1975. In August 1975, Bank decided to enforce its security interests because it was not satisfied with the financial progress of ARC. Paris Jet was advised that the collateral would be repossessed and sold.

Bank took over the collateral and all necessary steps were taken in order to sell the collateral. A public auction was held November 8, 1975 at Ventura County Airport near Oxnard. At the auction, 28 registered bidders were in attendance. Bank submitted a bid of $270,000.00, some $100,000.00 in excess of the other bids. IMA subsequently submitted a bid of $276,000.00. This was the highest bid and Bank accepted it. A bill of sale warranting title to the collateral was executed by Bank to IMA dated December 30, 1975, for all assets except for one jet. A separate bill of sale without warranty of title was executed for the other plane. The bills of sale were recorded with the FAA on February 3, 1976. Title to each aircraft was subsequently transferred by IMA to Personal Jet, its subsidiary. Personal Jet sold one of these planes to Marhoefer and McKinney.

The fourth plane seized in San Antonio had the following history. When Paris Jet was formed, Sikking transferred his personal Paris jet to the corporation with the understanding that he would receive in exchange a similar Paris jet to be obtained later by Paris Jet. Sikking's plane was sold and another plane was purchased by Paris Jet. This plane was first transferred to ARC and then to IMA, Sikking's wholly owned corporation, to satisfy the obligation to Sikking. The bill of sale was recorded with the FAA on January 27, 1975. This plane was later transferred to Personal Jet, wholly owned subsidiary of IMA.

## I. Inapplicability of Uniform Fraudulent Conveyances Act.

Callihan initially contends that the district court erred in adopting the magistrate's report to the extent that it concluded that the Uniform Fraudulent Conveyances Act was not applicable to this case. Section 3439.04 of the Uniform Fraudulent Conveyances Act (Act) provides that:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Section 3439.03 states that:

> Fair consideration is given for property, or obligation:

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in the amount not disproportionately small as compared with the value of the property, or obligation obtained.

Based on this language, it is clear that the Uniform Fraudulent Conveyances Act of California will not invalidate the conveyances.

A. Fair Consideration.

■ Callihan contends that the conveyances made by ARC and Paris Jet were not made for fair consideration. He also claims that each conveyance rendered the corporations insolvent. Bank advanced $250,000.00 to ARC on November 7, 1974. Paris Jet was a guarantor with respect to this amount. The proceeds of the loan were used to purchase two Paris jets and spare parts. This note was secured initially by a letter filed with the FAA from ARC to Bank granting a security interest in two Paris jets. To the extent that the granting of the security interest constituted a conveyance, it was certainly made for ample consideration by advancing $250,000.00 to ARC since this was to secure a "present advance."

■ The next conveyance occurred on June 6, 1975, and involved the following circumstances. The note executed on November 7, 1974 had not been paid so Bank brought suit on the note in March 1975. A writ of attachment was obtained but was not enforced immediately. Negotiations between the parties resulted in Bank forbearing seizure of the planes in exchange for the pledging of additional collateral. This also constituted fair consideration to secure an "antecedent debt" to the extent that the consideration was not "disproportionately small as compared with the value of the property." ARC and Paris Jet gave Bank security interests in the business assets of ARC, including five planes.

The only question is whether the consideration of forbearing on enforcing the writ of attachment designed to collect the $250,-000.00 is disproportionately small when compared to the value of the property subjected to the security interest. We find that it is not. Two of the planes were still located in the Netherlands and their value was speculative. The other three planes were located in Oxnard and were not operable. One of those had been in a hangar fire and could only be salvaged for parts. It is clear that the granting of the security interest was made for fair consideration.

■ The final conveyance was made by bills of sale on November 8, 1975. Bank was not satisfied with the financial progress of ARC so arrangements were made to sell the assets at a public auction to satisfy the debt of $250,000.00 for principal and $65,000.00 for interest. Bank's bid of $270,000.00 exceeded all other bids by $100,-000.00. IMA later made a bid of $276,-000.00 that was accepted by Bank. A bill of sale was executed. In light of the questionable condition of the assets, the district court correctly concluded that this conveyance, even if governed by the Act, was made for fair consideration.

■ The fourth plane in question was also conveyed for fair consideration. This plane was not involved in the financing transactions and the foreclosure. Subsequent to the formation of Paris Jet, Sikking transferred his personal Paris jet to the corporation in exchange for a promise that he would receive a similar Paris jet at a later time when purchased and remodeled by Paris Jet. A plane was transferred by ARC in January 1975 to IMA, Sikking's corporation, to fulfill this promise. Exchange of one aircraft for another aircraft constituted fair consideration. Because each exchange was made for fair consideration, we need not determine whether ARC or Paris Jet was rendered insolvent by any of the conveyances.

B. Intent.

■ Callihan contends that the conveyances were made with intent to defraud the

creditors in violation of § 3439.07 which provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Uniform Fraudulent Conveyances Act § 3439.07.

But there is no evidence presented which indicates that ARC or Paris Jet took any action with the actual intent to defraud Callihan. The only evidence was that Sikking, a 24.5% owner of Paris Jet also owned IMA and Personal Jet. This is certainly not evidence of actual intent to defraud. All parties were aware of Callihan's claims. But the conveyances were made for fair consideration in an attempt at first to avoid foreclosure and later for the purpose of selling to the highest bidder in order to minimize losses. There is no indication that assets were concealed or distributed to avoid Callihan's claims. The "conveyances" were made for legitimate business reasons. The magistrate's determinations, as adopted by the district court, are not clearly erroneous.

## II. *Uniform Commercial Code.*

This case is governed by Article 9 of the California Uniform Commercial Code (UCC). Cal.Com.Code § 9101 *et seq.* (West 1964). The provisions of the UCC relevant to this case can be summarized as follows. Article 9 covers any transaction, regardless of its form, which is intended to create a security interest in personal property. *Id.* § 9102(a). Section 9105(1) defines a security agreement as an agreement which creates or provides for a security interest. The security agreement is deemed to be effective according to its terms between the parties, against purchasers of the collateral, and against creditors. *Id.* § 9201.

A security interest becomes enforceable against a third party and against the debtor when (1) the debtor has signed a security agreement containing a description of the collateral, (2) value has been given, and (3) the debtor has rights in the collateral. *Id.* § 9203(1). The security interest attaches and becomes enforceable when these three requirements are satisfied. *Id.* § 9203(2). It may be enforced not only against currently existing collateral but the security agreement may provide that the obligations are also secured by after-acquired property. *Id.* § 9204(1).

While a security agreement is always enforceable between the parties, superior rights may be acquired against secured third parties by perfecting the security interest. Though there are several methods available to perfect a security interest, the most common method requires the filing of a financing statement. *Id.* § 9302(1). But the filing of a financing statement is not required if a United States statute provides a system of national registration. *Id.* § 9302(3)(4). Compliance with the statute will perfect the security interest in property. The Federal Aviation Act, 49 U.S.C. § 1301 *et seq.,* and the FAA regulations provide for the registration of aircraft. A security interest is finally perfected when it has attached and all the applicable steps required for perfection have taken place. § 9303(1).

When a debtor is in default on a security agreement, a secured party may reduce his claim to judgment, foreclose, or otherwise enforce his security interest by any available judicial procedure. *Id.* § 9501(1). After default, the secured party has the right to take possession of the collateral in any reasonable manner as long as it can be done without a breach of the peace. *Id.* § 9503. The secured party may then sell or otherwise dispose of the property in any commercially reasonable manner. *Id.* § 9504.

In November 1974, Bank granted ARC a loan of $250,000.00 to purchase two Paris jets and aircraft parts located in the Netherlands. ARC executed a note for that amount on November 7, 1974, and on the same day wrote a letter agreeing that the loan would be secured by two planes that would serve as collateral until the two new planes could be purchased and registered and replaced as collateral. This letter and a

forwarding letter of correction, used to substitute the correct aircraft registration numbers, were filed with the FAA on May 23, 1975, with respect to one of the planes.

■ It is clear that this letter constitutes a security agreement granting Bank a security interest in the plane and after-acquired property to the extent the letter indicated that additional aircraft would be included as collateral. While the letter was not in the form required by the FAA to perfect a security interest, it was still sufficient to grant a security interest to Bank. No special form is necessary to create a security interest. *Komas v. Small Business Administration*, 71 Cal.App.3d 809, 139 Cal. Rptr. 669 (1977). It is sufficient if the parties use language that indicates the parties intended to create a security interest, *id.*, and if the security agreement reasonably identifies the property subject to the agreement. *Matter of California Pump & Mfg. Co., Inc.*, 588 F.2d 717 (9th Cir. 1973); *see also In re Amex-Protein Development Corp.*, 504 F.2d 1056 (9th Cir. 1974). The letter was signed by the debtor and reasonably described the collateral as Paris jets and gave the proper registration number of the planes. Value was given in the form of a $250,000.00 loan. Therefore, Bank possessed a security interest enforceable against the debtor and third parties, such as Callihan, as of November 7, 1974.

■ Callihan filed a letter with the FAA enclosing a copy of his complaint with unilateral notice of his lien. This letter was not filed with the FAA until February 10, 1975, after the date Bank acquired its security interest. But even if the letter had been filed earlier, it was not sufficient to create a security interest pursuant to the requirements of § 9203(1). ARC never signed a security agreement with the intent to create a security interest for Callihan in certain collateral. Therefore, Bank was a secured creditor; Callihan was not. Bank's interest was superior to Callihan's at this time. When the note was not paid in March 1975, Bank filed suit on the $250,-000.00 note against ARC and the guarantors. Bank also sought a writ of attachment.

■ Instead of exercising its rights under Article 9 and foreclosing on the collateral, Bank entered into negotiations with ARC to try to salvage the business. As a result, ARC executed a security agreement on June 6, 1975, granting Bank a security interest in certain described collateral. All of the requirements of a security interest were satisfied, including the giving of value, since the UCC states that a person gives value for rights if he acquires them as security for or in total or partial satisfaction of a pre-existing claim. § 1201(44)(b). The pre-existing debt of $250,000.00 coupled with the forebearance of a foreclosure suit constituted value. *Western Decor & Furnishings Industries, Inc. v. Bank of America National Trust and Savings Association*, 91 Cal.App.3d 293, 154 Cal.Rptr. 287 (1979); *see also Copeland v. Stewart*, 52 Cal.App.3d 217, 124 Cal.Rptr. 860 (1975). The security interests were perfected pursuant to § 9302(3) when the formal security agreements executed by ARC were filed with the FAA on June 27, 1975.

■ As the secured party with the superior interest in the collateral, Bank had the right to dispose of the collateral upon default of ARC in order to foreclose its security interest pursuant to § 9501. Section 9504 authorized Bank to sell the collateral in any commercially reasonable manner. The sale could be "as a unit or in parcels, at wholesale or retail and at any time and on any terms, provided the secured party acts in good faith and in a commercially reasonable manner." § 9504(3). Notice need only be given to the debtor and to any other person who has a security interest in the collateral and who has filed with the secured party a written request for notice. Callihan never filed this request for notice with Bank and thus was not entitled to notice.

■ A sale is commercially reasonable where it is done in public, during business hours, upon adequate notice within a reasonable time of repossession, and under conditions reasonably calculated to bring a fair market price. *General Electric Corp. v.*

*Bo-Mar Construction Co.*, 72 Cal.App.3d 887, 140 Cal.Rptr. 417 (1977). The sale by Bank satisfies these requirements. After Bank took over the collateral, a professional appraiser and auctioneer was retained to inventory, advertise, and display the collateral before sale at a *public* auction. Notice was given as prescribed by California law and the auctioneer distributed brochures on the sale. The auction was held at a county airport with 70 people in attendance, of whom 28 were registered bidders. IMA submitted a bid of $276,000.00, some $100,-000.00 in excess of the other bids, and it was accepted. This public sale satisfied the requirements of Article 9 and will not be set aside. IMA obtained good title and it could transfer good title to its transferee, Personal Jet. Therefore, when Callihan finally received his judgment in 1977, he could not enforce his judgment against Paris Jet against this collateral owned by Personal Jet.

In summary, this case is governed by the California UCC. As such, the district court properly granted Bank a permanent injunction enjoining Callihan from taking steps to enforce a judgment against certain described aircraft owned by Personal Jet.

AFFIRMED.