Filed 4/22/14  Mobasser v. Yermian CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| AMIR HOUSHANG MOBASSER, Plaintiff and Respondent, v. JOHN PAUL YERMIAN, Defendant and Appellant. | B247269 (Los Angeles County Super. Ct. No. BC448253) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory W. Alarcon, Judge.  Reversed and remanded.

Horvitz & Levy, Daniel J. Gonzalez and Curt Cutting; Robinson DiLando, Michael C. Robinson and Joshua A. Najemy for Defendant and Appellant.

The Ehrlich Law Firm and Jeffery Isaac Ehrlich for Plaintiff and Respondent.

_____

John Paul Yermian appeals from the judgment entered upon jury verdicts in favor of respondent Amir Houshang Mobasser on his complaint against appellant alleging causes of action for breach of contract, fraud and breach of fiduciary duty arising out of an oral partnership agreement to remodel and sell a convenience store. In addition, appellant also appeals from the post-judgment order denying him fees and costs. Appellant asserts several errors on appeal. Specifically he claims that (1) the evidence presented in support of the emotional distress and punitive damages was legally insufficient and the awards were excessive; (2) the court erred in denying his cross-complaint for an accounting; and (3) the court erred in denying his post-judgment motion for fees under Code of Civil Procedure section 2033.420 (allowing for costs incurred in proving a matter not admitted by opposing party in request for admission). As we shall explain, sufficient evidence did not support the award of emotional distress damages. In addition, appellant's argument on the punitive damage award has merit; respondent failed to present sufficient evidence of appellant's ability to pay the award. Appellant has also demonstrated that he was entitled to an accounting. Finally, the matter must be remanded for the trial court to determine whether appellant is entitled to fees under Code of Civil Procedure section 2033.420. Accordingly, we reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

1. *The Parties*

Appellant and respondent both emigrated from Iran. They are also close relatives—respondent is appellant's uncle.[2] Respondent testified that since appellant was a child, respondent cared for and treated appellant like a son. Respondent was a successful businessman in Iran. He supported appellant's family when appellant's

---

[1]    The Factual and Procedural Background describes only those facts and circumstances that are relevant to the issues on appeal.

[2]    Both parties are also in poor health. Appellant is 60 years old and is terminally ill with bladder cancer. Respondent is in his eighties and has a cardiac condition.

mother struggled financially. Eventually appellant moved to the United States with his mother, while respondent stayed in Iran.

Appellant attended UCLA and in the mid-1980s he obtained his M.D. from UC Irvine. Appellant went into private practice as a cosmetic surgeon in Van Nuys, California. Appellant opened an outpatient-surgery center called Plaza Medical Clinic located in a multi-tenant commercial building. A 7-Eleven market was one of the building's tenants.

In 1989, respondent immigrated to the United States and opened a clothing business. He renewed his relationship with appellant, helping appellant when he underwent a divorce in the mid-1990s.[3] In 2002, respondent retired from the clothing business and became financially dependent on his children.

2.    *The Property*

The commercial building where appellant's medical practice was located was owned by MacJay, a partnership between appellant and his father-in-law. Appellant testified at trial that he owned a 25 percent interest in MacJay. When the 7-Eleven's lease was about to end, appellant consulted with respondent about whether the lease should be renewed. Appellant wanted to increase 7-Eleven's rent for the new lease term, but the store's owners had threatened to vacate the premises at the end of the term if the rent were significantly increased.

At trial the parties told different versions of the advice respondent gave to appellant about the situation. According to respondent, he urged appellant to renew the lease even if that meant collecting less rent than appellant wanted because the store attracted walk-in customers for the other tenants and was therefore important to the property's overall value. Respondent testified that he warned his nephew that if 7-Eleven left, the other businesses in the building would also vacate. According to appellant, respondent urged him to reject the offer from 7-Eleven so they could start their own convenience store in the same location. Ultimately, 7-

---

[3]    Respondent testified that when appellant was seeking a divorce respondent helped him conceal his acquisition of a residential property. Appellant apparently sought to hide the transaction from any potential creditors, so he purchased the property in respondent's name.

Eleven and MacJay could not agree on the lease terms, and as a result 7-Eleven closed the store and vacated the premises.

### 3. The Partnership

The space that the 7-Eleven had occupied in the building was left in poor condition; it required repairs and remodeling before it could be leased to a new tenant. Appellant consulted respondent for advice about the situation and they agreed that it would be easier to attract a new tenant if they remodeled the space and proved that a replacement convenience store could operate there. They planned to open the store after a few months of set-up and then sell it as soon as possible. They consulted with a real estate broker who advised them that they could sell a convenience store for about $600,000. Appellant and respondent orally agreed to form a partnership[4] to open and thereafter sell the convenience store.

Appellant had the funds to execute the plan, but he was too busy to carry them out because of his medical practice. Respondent agreed to oversee the remodel and manage the convenience store until it could be sold.

Appellant told the jury that he and respondent had a "garden-variety" partnership – a 50/50 partnership, in which appellant would pay the expenses, respondent would act as manager, and they would share the *net* proceeds from the sale, which he projected at a total of $400,000, so they could each receive $200,000 from the sale.[5]

According to respondent, however, the agreement was *not* a "garden variety" 50/50 partnership. As respondent described the partnership, appellant agreed to provide the capital

---

[4] In his initial complaint and throughout the trial respondent claimed he was an employee with no ownership interest in the partnership. However, shortly before closing arguments at the end of the first phase of the trial, respondent stipulated that he and appellant were partners. He also amended his complaint to delete all allegations that he was an employee as well as his causes of action alleging Labor Code violations based on his status as an employee.

[5] Appellant testified that he agreed, on behalf of MacJay, not to charge the store for rent during the initial startup period, and that he and respondent agreed the store would start paying rent to MacJay if they could not sell the market within four or five months.

4

and respondent would perform all management functions. In respondent's view appellant would make a profit from the partnership even if they did not make money on the sale of the new store because his commercial property value would increase as a result of the remodel and replacement of the convenience store and because once sold the new owners would become a long-term tenant of the building. In contrast, respondent's contribution to the partnership was his expertise as a businessman. According to respondent, splitting the *net* profits from the sale 50/50 would have produced illogical and unfair results by assigning zero value to respondent's donation of time to the partnership. Therefore, according to respondent, they agreed to split the *gross* proceeds from the sale of the convenience store. Appellant offered to treat respondent's labor as equal in value to his own financial contribution. In addition, because of respondent's age and poor health, appellant offered him a $16 hourly wage while working towards the sale of the store.

### 4. The Store

Respondent supervised the remodeling work for the new convenience store, which took about eight weeks to complete. Appellant paid a total of $185,000 in expenses to complete the project. In the spring of 2008, the store, called Citi Market Place, opened for business. Respondent acted as its handyman and manager; he testified that he worked seven days a week, for at least 60 hours a week, and never took a day off.[6]

Respondent had only planned to work for a few months, because he and appellant believed they would be able to sell the store quickly. However, the economic downturn made it difficult to turn a profit and difficult to find a buyer for the store. Finally, after a year and half, in September 2009, they received and accepted an offer to purchase the market for

---

[6] Respondent was never paid the $16 an hour wages under the partnership agreement. Appellant, however, paid him lump sums of $5,000 at the outset of the project and another $5,600 shortly before the store was sold.

5

$165,000.[7] Based on their partnership agreement, respondent believed he was entitled to receive $82,500 from the sale, plus his hourly wages.

5. *The Escrow and Release of the Funds*

The $165,000 proceeds from the sale of the store were deposited into an escrow account. In September 2009, respondent and his son visited the escrow company so that he could obtain the release of the sale proceeds. The escrow agent asked respondent to sign a letter that said all funds should be released to appellant. According to respondent, he refused to sign the document and left the escrow office. Respondent then confronted appellant about the document, and according to respondent, appellant refused to honor the terms of the partnership agreement that they share in the *gross* proceeds of the sale. Appellant claimed that he was entitled to retain all $165,000 to reimburse himself for his $185,000 investment in the store.

Respondent also learned that the close of escrow was being delayed by a number of outstanding liens against him. Respondent and his son worked to resolve the issues with the liens.[8] In the spring of 2010, respondent's son contacted the escrow company to explain that he now owned the only outstanding lien. The escrow company apprised him that the funds held in the escrow account had already been released to appellant.

Apparently, a letter was sent to the escrow company on September 11, 2009, purportedly containing respondent's signature, directing the escrow company to release all the funds to appellant. At trial respondent denied that he wrote or signed that letter, and appellant also denied that he wrote the letter or forged respondent's signature on the letter. Nonetheless, the escrow company did not release the funds because of the judgment lien against respondent.

---

[7] The new owners signed a 20-year lease for higher rent than 7-Eleven had been paying. The buyers of the store agreed to pay MacJay a monthly rent of $5,700 for the first two years with a rent to increase to $6,700 in year three, $7,200 in years four and five, and $7,700 in year six. For the next four years the rent would increase 3 to 5 percent per year, and in the final 10 years of the 20-year lease the rent would be at market rates, subject to negotiation.

[8] In April 2010, respondent's son purchased one of the liens from the holder (Wells Fargo) and was able to get the others released.

Thereafter, in November 2009, the escrow company also received a letter that purported to be from the general counsel of the holder (Wells Fargo) of the remaining outstanding judgment lien that indicated that the lien had been released. Based on the letter, the escrow company issued a check for $162,983.85, dated February 25, 2010, in appellant's name.[9]

On February 26, 2010, a day after the check was issued, but a few days before appellant went to pick it up on March 1, 2010, appellant faxed a fake partnership agreement to the escrow company. The partnership agreement stated that appellant owned 99 percent of the partnership and respondent owned one percent. At trial, appellant acknowledged that the written partnership agreement did not represent the actual terms of the partnership; he claimed however that respondent had concocted a scheme of preparing a sham partnership agreement and submitting it to the escrow company to persuade the escrow company to release the funds despite the liens. Respondent denied having anything to do with the sham agreement and his handwriting expert opined that his signature on that document was probably not authentic.

6. *The Litigation*

In October 2010, respondent filed the instant action against appellant asserting causes of action for breach of oral contract, breach of the implied covenant of good faith and fair dealing, and various tort claims including fraud. Appellant filed a cross-complaint asserting various causes of action including an accounting.

During discovery, appellant served respondent with requests for admission, including a request that respondent admit that he was not an employee of the Citi Market Place or of appellant. Respondent denied the request. Respondent also amended the complaint twice; when the case went to trial respondent's causes of action were: breach of oral contract, fraud, breach of fiduciary duty, and violation of California Labor Code sections 201-203, 226. Respondent's Labor Code claims were based on his allegation that he was appellant's employee and that appellant failed to pay him wages during the term of his employment. Respondent also sought an award of attorney's fees based on the Labor Code claims.

---

[9] This letter was not genuine. The lien described in the letter was not released by Wells Fargo until April 2010 when it was purchased by respondent's son.

The court ordered the trial bifurcated--the first phase dealt with liability and compensatory damages, and the second phase dealt with punitive damages.

At the outset of the first phase, respondent's counsel told the jury that respondent did not believe a partnership existed. Respondent's counsel sought to prove through his questioning of appellant that respondent was his employee, but appellant insisted that respondent was a partner, not an employee. However, after the close of evidence in the first phase, and just before closing arguments, respondent stipulated that he had a 50/50 partnership with appellant. Respondent also amended his complaint, deleting all allegations that he was an employee and abandoning his Labor Code violation claims. Instead he alleged that a partnership existed and that appellant breached the partnership agreement and breached his fiduciary duties as a partner.

The jury reached verdicts in favor of respondent on his claims for breach of contract, breach of fiduciary duty and fraud ("false representation" and "concealment"), and awarded him $126,291.93 in economic damages. That amount included 50 percent of the gross income from the sale of the store, plus $44,800 for lost wages. The jury also awarded $92,640 for emotional distress on the breach of fiduciary duty cause of action. The jury also answered "yes" to the question whether appellant had acted with fraud, oppression, or malice.

In the second phase of the trial, respondent called appellant as a witness regarding his own financial condition. The jury awarded $481,068.07 in punitive damages for the respondent.

Respondent submitted a proposed judgment. Appellant objected, asserting that the court had not yet ruled on the cross-complaint for an accounting. The court held a hearing and accepted briefing on the issue. The court then ruled that appellant was not entitled to an accounting because he never sought dissolution of the partnership and because the jury's verdict resolved all the outstanding issues.

Thereafter, the court entered judgment for respondent.

### 7. *Post-Judgment Proceedings*

On March 1, 2013, appellant filed timely motions for new trial and for judgment notwithstanding the verdict (JNOV). The court denied both motions.

8

Appellant also filed a motion under Code of Civil Procedure section 2033.420 for the $23,408 fees he incurred as a result of respondent's failure to admit, in response to a request for admissions, that he was not an employee of Citi Market Place. The court denied the motion.

Appellant timely appealed from the judgment and the post-judgment order denying his motion for the fees and costs. This court consolidated the appeals upon stipulation of the parties.

## *DISCUSSION*

Before this court, appellant asserts that the evidence presented in support of the emotional distress and punitive damages was legally insufficient and that the awards were excessive. He also argues that the trial court erred in denying his cross-complaint for an accounting; and erred in denying his post-judgment motion for fees and costs under Code of Civil Procedure section 2033.420. We address his assertions in turn.

## I.    The Award for Emotional Distress Damages

Appellant argues that as a matter of law the evidence presented did not support the damages for emotional distress awarded as non-economic damages on the breach of fiduciary duty cause of action. Appellant asserts that emotional distress evidence did not show "serious" or "severe" emotional distress as required by the relevant case law. In the alternative, appellant asserts that the award is excessive.

### A.    Respondent's Evidence of Emotional Distress

Respondent sought an award of emotional distress damages in connection with his cause of action for breach of the partnership fiduciary duties. Respondent's testimony supplied the only evidence on the issue of emotional distress. He testified as follows:

> "[Counsel]:  Did this situation you have with your nephew, has this affected your health and emotional life, if you will?
>
> "[Respondent]:  Unfortunately, yes.
>
> "[Counsel]:  And could you please tell me how it has affected you?

9

"[Respondent]: He make [sic] betray to me.

"[Counsel]: What—how has it affected your health and your emotions? You've been sad, sleepy, sick?

"[Respondent]: He made me—never I was expecting to he do it something with me. All of life I help his parents, when they was broken. I was helping everybody of his family all the time. Whatever he wanted I did for him. And he never answered this much that I help him even one penny.

"[Counsel]: Have you lost sleep over this?

"[Respondent]: Yes. This is more than two years that I'm not good.

"[Counsel]: Tell me a little bit more on how you're not good.

"[Respondent]: He didn't think the situation well. You don't know about my honor, you don't know my feeling. You don't know anything about me. In all of my life I was a person that didn't do anything wrong. And I never expect something like this.

"[Counsel]: Did Dr. Yermian ever tell you one time that he was sorry?

"[Respondent]: Never. He has nothing in here and here.

"[Counsel]: Have you had to go to any doctors because of how your health or emotions—

"[Respondent]: Yes. This is almost three years or more. I'm going to doctor. The medicine that I use is more than several kilos.

"[Counsel]: Several what?

"[Respondent]: Pounds.

"[Counsel]: Of what?

"[Respondent]: Because I was sick. I had too many doctor to give me prescription.

"[Counsel]: Is it easy for you to sleep at night?

10

"[Respondent]:  No, this is long time I didn't sleep good.

"[Counsel]:  As you sit here today, are you still devastated by this?

"[Respondent]:  I'm sorry, I don't know the meaning devastated.

"[Counsel]:  Are you brokenhearted—

"[Respondent]:  Yes.

"[Counsel]: —about this?

"[Respondent]:  Yes, this is long time."

The jury awarded $92,640 in non-economic emotional distress damages based on breach of fiduciary duty cause of action.

B.    **Legal Standard for Emotional Distress Damages**

In general, if a plaintiff is seeking emotional distress damages the law requires proof that the emotional distress must be "serious and severe and enduring," rather than trivial and transitory.  (See *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 927-930 [holding that to recover damages for emotional distress on a claim of negligence where there is no accompanying personal, physical injury, the plaintiff must show that the emotional distress was "serious"]; *Fletcher v. Western National Life Insurance Company* (1970) 10 Cal.App.3d 376, 396-397 [providing that although "emotional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry" to make out a claim of intentional infliction of emotional distress, the plaintiff must prove that emotional distress was severe and not trivial or transient].)

Respondent claims this standard does not apply to his case and urges this court to adopt a lesser standard of severity applied in insurance cases.  In the context of bad faith insurance claims some courts have found that no heightened showing of extreme distress or

11

severe emotional injury is required to obtain damages for mental suffering that ensues from the breach of the implied covenant of good faith and fair dealing in insurance contracts. (See *Gruenberg v. Aetna Insurance Company* (1973) 9 Cal.3d 566, 579-581; *Gourley v. State Farm Mutual Automobile Insurance Company* (1991) 53 Cal.3d 121, 128 [following *Gruenberg*]; *Clayton v. United Services Automobile* (1997) 54 Cal.App.4th 1158, 1162 [observing that for insurance bad faith actions the California Supreme Court has rejected any requirement that to be compensable the emotional distress suffered must be "severe, substantial or enduring"].) However, none of the cases respondent cites for this rule concerns the tort claim at issue here—breach of fiduciary duties arising from a partnership—and in fact all of the published case law concerns insurance cases where emotional distress damages were awarded on an insurance claim. Respondent has offered no convincing argument to this court to extend the application of the lower standard beyond the context of bad faith claims to this case.

Accordingly here, respondent was required to prove that his emotional distress was "severe" or "serious," "non-trivial" and enduring. Even applying the deferential sufficiency of the evidence standard of review to our assessment of respondent's evidence, we conclude respondent did not establish that he suffered severe or enduring emotional distress as a result of appellant's conduct. Respondent testified that he felt betrayed, dishonored and heartbroken because of the situation. He also testified that he "lost sleep" and that for two years "I'm not good." He told the jury that he had been sick, sought medical treatment and had to take medication. Other than respondent's feelings of betrayal and having lost sleep, his testimony did not attribute any of his emotional or physical injuries directly to appellant's conduct. Respondent's testimony does not show a causal connection between these injuries and appellant's conduct . Moreover, respondent's complaints about sickness, medical treatment, medication and even loss of sleep are vague and lack the necessary specificity to support a finding that these injuries were enduring. Furthermore, respondent's failure to corroborate the injuries with any other evidence, including medical evidence or records or eyewitness accounts, undermines finding that his emotional distress was severe or serious. In short, the

12

evidence respondent adduced at trial was not sufficient as a matter of law to satisfy the standard of severity to support a recovery for emotional distress. Accordingly, the jury's award of non-economic emotional distress damages must be reversed.[10]

## II. The Punitive Damages Award

Appellant also contends the evidence presented during the trial was insufficient to support the jury's award of $481,068.07 in punitive damages against him. Specifically, he challenges the sufficiency of the evidentiary showing regarding his financial condition; appellant argues his conduct does not support the punitive damage award; and finally, he claims that the award is excessive in relation to his ability to pay. As we shall explain, respondent failed to present sufficient evidence of appellant's financial condition.

### A. Evidence Presented at the Punitive Damage Phase of the Trial

At the end of the first phase of the trial the jury returned a verdict finding that on the fraud claim, appellant had engaged in "fraud, oppression or malice." Based on this finding the matter proceeded to the second phase of the trial for the presentation of evidence and argument concerning the punitive damages. At the outset of the punitive damage phase of the trial, respondent called appellant as a witness and asked him about documents he had produced in response to respondent's request for "financial documents." Appellant brought five pages of documents, showing the balances in his checking accounts of approximately $9,000. Respondent asked whether appellant brought copies of his tax returns, "brokerage accounts," "copies of titles of real property" and "evidence" of motor vehicles that appellant owned. Appellant responded that he did not bring those documents.

Respondent proceeded to ask appellant about his "annual salary." Appellant testified that he was no longer working, but that his personal salary from his medical practice had been $66,000. Asked about other sources of income, appellant stated he

---

[10] In view of our conclusion we do not reach appellant's argument that the award of emotional distress damages is excessive.

13

earned about $30,000 to $40,000 from his partial ownership interest in MacJay. Appellant further testified that, in addition to the approximately $9,000 in his checking accounts, he had $18,000 in stocks. He also told the jury that his wife's annual salary was approximately $120,000. Appellant testified that he owned two homes with combined equity of $150,000; and appellant volunteered that he had a $700,000 mortgage on one home and $250,000 mortgage on his second home Appellant disclosed that he had a medical practice, 25 percent ownership interest in MacJay and two cars, but was not asked about the value of those assets or about any liabilities, liens or encumbrances with respect to them. He was also asked about his "monthly expenses" to which he estimated at about $10,000 a month. He testified that he had been diagnosed with terminal bladder cancer five months before trial and had paid $28,406.93 in medical bills for his treatment. Appellant stated that he had other outstanding bills he had not paid.

At the conclusion of the punitive damage phase of the trial, the jury returned a verdict awarding respondent $481,068.07 in punitive damages on respondent's fraud cause of action.

### B.    Law Governing Punitive Damages and Analysis

"In a civil case not arising from the breach of a contractual obligation, the jury may award punitive damages 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.' (Civ .Code, § 3294, subd. (a).)" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712.) In reviewing a challenge to an award of punitive damages, courts traditionally "determine whether the award is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109-110.) To make this determination, courts consider three factors: (1) the degree of reprehensibility of the defendant's conduct; (2) the amount of compensatory damages awarded; and (3) the defendant's financial condition or wealth. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 690, fn. 18.)

"We review the trial court's award of punitive damages for substantial evidence." (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679.)  A punitive damages award cannot be sustained absent meaningful evidence of the defendant's financial condition.  (*Adams v. Murakami, supra,* 54 Cal.3d at p. 109; *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680.)  Indeed, "[b]ecause the important question is whether the punitive damages will have the deterrent effect without being excessive, an award that is reasonable in light of the first two factors, reprehensibility of the defendant's conduct and injury to the victims, may nevertheless 'be so disproportionate to the defendant's ability to pay that the award is excessive' for that reason alone.  [Citation.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 620.)  The plaintiff has the burden of presenting evidence and the burden of proof regarding the defendant's financial condition.  (*Adams v. Murakami*, *supra,* 54 Cal.3d at p. 123; *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 83, fn. 9.)

The evaluation of a defendant's financial condition must be considered in light of the purposes of punitive damages: to punish the defendant and deter the commission of wrongful acts.  (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 928, fn. 13.)  These policies are not served if the defendant's wealth allows him to absorb the award with little or no discomfort.  (*Id.* at p. 928.)  The "'wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective.'  [Citation.]" (*Adams v. Murakami*, *supra,* 54 Cal.3d at p. 110.)  Conversely, "'the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.'"  (*Ibid.;* see also *Rufo v. Simpson, supra,* 86 Cal.App.4th at p. 620.)

There is no established method or standard for determining a defendant's financial condition when evaluating an award of punitive damages.  (*Bankhead v. ArvinMeritor, Inc., supra,* 205 Cal.App.4th at p. 79.)  Although the defendant's net worth is commonly used in assessing punitive damages, it is not the exclusive measure.  (*Rufo v. Simpson, supra*, 86 Cal.App.4th at p. 621.)  Standing alone, neither net worth, nor assets, nor income is sufficient to support punitive damages.  (See *Zaxis Wireless Communications,*

15

*Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 582 [net worth too easily manipulated to be the sole standard for ability to pay]; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1065 [evidence of earnings is not by itself sufficient].)  Moreover, absent other measures of ability to pay, evidence of profits wrongfully obtained by the defendant is also inadequate.  (*Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152.)  To obtain a meaningful understanding of the defendant's wealth, evidence of liabilities should normally accompany evidence of assets, and evidence of expenses should accompany evidence of income.  (*Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 680; see also *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 57.)  Ultimately, "'[w]hat is required is evidence of the defendant's ability to pay the damage award.'"  (*Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 680; see also *Adams v. Murakami, supra,* 54 Cal.3d at p. 112.)  In addition, the defendant's wealth is to be measured as of the time of the trial on punitive damages.  (*Washington v. Farlice* (1991) 1 Cal.App.4th 766, 777; *Zhadan v. Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839.)

In our view, respondent did not carry his burden to prove appellant's financial condition during the trial.  The evidence in the record is insufficient to demonstrate appellant's overall ability to pay the punitive damage award.  Although the substantial evidence standard is deferential to the fact finder, "this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . .  '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance.  Obviously the word cannot be deemed synonymous with "any" evidence.  It must be reasonable . . . , credible, and of solid value. . . .'  [Citation.]"  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

The evidence presented constitutes an incomplete picture of appellant's financial condition as of the time of trial.  The evidence elicited at trial presented only a limited picture of appellant's assets, and revealed almost nothing about his liabilities.  There was no evidence of the value of his medical practice, the value of his interest in MacJay or his

vehicles, or other current assets, if any. Respondent did not present evidence or even inquire about any liabilities or indebtedness (or equity) attached to these assets. (See *Kelly v. Haag* (2006) 145 Cal.App.4th 916, 917 [even if defendant currently owned properties, absence of evidence of encumbrances or other liabilities on them defeats punitive damages award].) Respondent did ask appellant about his "monthly expenses," and appellant volunteered that he had mortgages on his two homes. Nonetheless, respondent did not inquire whether those expenses and mortgages represented the full extent of his liabilities.

In short, even viewing the record in the light most favorable to the judgment, there was insufficient evidence from which the trier of fact—or this court on appeal—could determine whether appellant would be able to pay the award of $481,068.07 in punitive damages at the time of trial. (See, e.g., *Baxter v. Peterson, supra,* 150 Cal.App.4th 673, 681 ["In sum, although the record shows that [defendant] owns substantial assets, it is silent with respect to her liabilities. The record is thus insufficient for a reviewing court to evaluate [defendant's] ability to pay $75,000 in punitive damages."]; *Kelly v. Haag, supra,* 145 Cal.App.4th at p. 917 ["[W]ithout any evidence [defendant] still held the assets, or of the amounts of his liabilities, the $75,000 award is unsupported by substantial evidence and excessive."].) "Without such evidence, a reviewing court can only speculate as to whether the award is appropriate or excessive." (*Adams v. Murakami, supra*, 54 Cal.3d at p. 112.) Respondent's counsel did not ask enough questions during the punitive damage phase of the trial relating to appellant's liabilities or financial obligations to prove appellant's net worth (assets minus liabilities).

Before this court, respondent does not claim that he presented a full or adequate picture of appellant's financial liabilities at trial. Instead, he claims that appellant "thwarted" respondent's attempt to obtain proof of his financial condition, and therefore is in no position to complain about the sufficiency of the evidence (or lack thereof) of his net worth. Respondent asserts that appellant failed to produce documents and financial information he requested pursuant to a notice to produce financial documents for trial,

17

and as a result has "waived" any right to complain by failing to be more forthcoming with evidence of his financial condition.

Respondent's argument is not persuasive. Although at the outset of the punitive damages trial respondent's counsel referred appellant to a "request" he had made to appellant for "financial documents," respondent's notice to produce documents was never presented to the trial court, and has not been included in the record on appeal. Thus, this court cannot assess the scope of the request or determine whether appellant failed to comply with it. References made by respondent's counsel suggest that the request may have sought documents and information including appellant's tax returns[11] and evidence of "brokerage accounts," "titles to real property," and "evidence" of motor vehicles that he "owned." However, because the actual request is not in the record before this court, we cannot discern if these items were requested or whether the request sought information which would have revealed appellant's encumbrances, liens or obligations, if any. Respondent has pointed to no evidence in the record to show that he asked for anything that appellant failed to produce relating to his liabilities.[12] Appellant cannot be penalized for failing to produce items or information which was never requested of him. Likewise because respondent never sought a court order compelling appellant to produce financial records based on any request to produce documents, respondent is not entitled to the benefit of any favorable evidentiary inference or legal argument based on appellant's

---

[11]    Individual tax returns are privileged under California law. Under certain circumstances, including where a party is seeking punitive damages, a trial court may determine that privilege gives way to the need for disclosure. (See *Weingarten v. Superior Court* (2002) 102 Cal.App.4th 268, 274-277.) Here, however, it does not appear that the court was asked to make that determination.

[12]    Although respondent asked appellant whether the documents he brought with him to trial showed "the universe of all money you have," that question is fairly interpreted to seek only to inquire about assets, and in fact, appellant's response: "I have also stocks…" underscores the view that respondent was attempting to determine the scope of appellant's assets. Respondent did not follow-up with questions seeking to determine the extent of appellant's liabilities.

18

failure to produce the documents he requested. (See *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 608–609 [holding that defendant who fails to comply with a court order to produce records of his or her financial condition may be estopped from challenging a punitive damage award based on lack of evidence of financial condition to support the award]; *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1338 [ holding that a defendant's failure to comply with the subpoena for financial records in the punitive phase of the trial, precludes the defendant from challenging the punitive damage awards based on lack of evidence of his financial condition or insufficiency of the evidence to establish his ability to pay the amount awarded].) That said, respondent has not demonstrated that the cases he cites, in which the court determined that a party's failure to comply with discovery requests and court-ordered production waived any challenges to sufficiency of the evidence, apply under the facts of this case.

In view of the foregoing, we conclude that the award of punitive damages cannot stand.[13] Finally, because our reversal is based solely on insufficiency of the evidence, we conclude that we must strike the punitive damages award from the judgment, and that no retrial of the punitive damages issue is warranted. "'When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial is ordinarily allowed, save for newly discovered evidence. . . . Certainly, where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper . . . . [¶] . . . [A] reversal of a judgment for the plaintiff based on insufficiency of the evidence should place the parties, at most, in the position they were in after all the evidence was in and both sides had rested.' (*McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661; accord, *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 626-627.) In another context, our Supreme Court explained in *Silberg v. Anderson* (1990) 50 Cal.3d

---

[13]     In light of our conclusion, we do not determine the merits of appellant's other arguments assailing the punitive damages award.

19

205, 214, that '[f]or our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings.'" (*Kelly v. Haag, supra,* 145 Cal.App.4th at p. 919.)

Here, as in *Baxter v. Peterson supra,* 150 Cal.App.4th at page 681, respondent had "'a full and fair opportunity to present his case for punitive damages." (*Kelly v. Haag, supra,* 145 Cal.App.4th at p. 919.) When a punitive damage award is reversed based on the insufficiency of the evidence, no retrial of the issue is required. Likewise in *Robert L. Cloud & Associates, Inc. v. Mikesell, supra,* 69 Cal.App.4th at p. 1154, the court reversed a punitive damages award because there was no evidence of the defendant's financial condition, and it did not remand for retrial. In view of this case law, we strike the punitive damages from the judgment without ordering retrial.

## III.    Appellant's Cross-Complaint for An Accounting

Appellant argues that the trial court erred in ruling on his cross-complaint in which the court refused appellant's claim for an accounting.

### A.    Background

After the verdict was entered for the second phase of the trial, appellant filed a motion requesting the court to make a determination on his cross-complaint seeking an accounting. Respondent opposed the request arguing that appellant was not entitled to an accounting because: (1) an accounting is a derivative action rather than a stand-alone claim; and (2) the claim was unnecessary in light of the jury's verdicts which, in respondent's view, had resolved all of the issues between the partners with respect to the partnership. The trial court denied appellant's request for an accounting and entered judgment on the cross-complaint in favor of respondent. The court concluded that an accounting was unnecessary in view of the jury's verdicts, and that appellant could not seek an accounting because he had not filed an action for the dissolution of the partnership.

### B.    Analysis

Pursuant to statute each partner is entitled to an accounting of partnership accounts and business at the end of a partnership. (Corp. Code, § 16807, subd. (b) and Corp.

20

Code, § 16401.) Partnerships are dissolved, among other occurrences by operation of law, when the partnership's particular undertaking is complete. (See Corp. Code, § 16801, subd. (b)(2)(c).) A partner need not file an action to seek formal dissolution of the partnership in order to obtain an accounting. (See *Goldstein v. Burstein* (1960) 185 Cal.App.2d 725, 727 [a claim for an accounting brought after voluntary dissolution of the partnership].) In addition, because a partner's right to an accounting derives from the Uniform Partnership Act, a claim for an accounting brought by a *partner* can be a stand-alone claim. (Cf. *Janis v. California State Lottery* (1998) 68 Cal.App.4th 824, 833 [holding cause of action for an accounting was derivative and must be based on other claims in a case where accounting is brought by third-party, non-partner].)

Furthermore, an accounting is an equitable remedy to be decided by the court, not the jury; the court's factual determinations are subject to the abuse of discretion standard of review. (See *Philip Heller v. Pillsbury, Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1392 [equitable principles apply to the court's determination of the rights of the parties in an action for an accounting between partners, in the dissolution of the partnership, and settlement of its affairs; the court's decision on these matters is reviewed for an abuse of discretion].)

In view of these principles, the trial court erred in denying the request based on the conclusion that appellant had to sue for dissolution of the partnership to obtain an accounting of partnership assets. Here the partnership had been dissolved as a matter of law when the undertaking of the partnership—to remodel and sell the convenience store—was complete. Appellant did not repudiate the partnership. Instead, the jury's verdict supported a finding that he breached the partnership agreement after the partnership ended when appellant failed to compensate respondent pursuant to the terms of their agreement. "A breach of the partnership agreement does not necessarily result in a forfeiture of the partner's interest or deprive him of his right to an accounting." (*B.K.K.*

21

*v. Schultz* (1970) 7 Cal.App.3d, 786, 797.)  Thus, an accounting request was still viable.  This case falls within the general rule that a partner is entitled to an accounting.[14]

We are also not convinced that the jury's verdict eliminated the need for an accounting.  The jury did not assess any debits to respondent's partnership account, which included the cost of his salary to the partnership and other partnership expenses.  The jury was not asked to examine all of the matters contained in Corporations Code section 16401 that a court sitting in equity would consider when deciding a party's entitlement to an accounting.

Accordingly, the court erred in entering judgment for respondent on the claim for an accounting without considering those matters included in Corporations Code sections 16807 and 16401 pertaining to an accounting of the partnership assets and obligations.  The judgment must be reversed and remanded for further proceedings on appellant's cross-complaint for an accounting.  On remand, in determining the accounting the trial court is bound by the express and implied findings of the jury.  The accounting proceedings should be limited in scope to determine the amount of offset, if any, to respondent's award of economic damages reflecting the costs of respondent's salary to the partnership and other partnership expenses and relevant matters contained in Corporations Code section 16401, in view of each party's share of the partnership.

## IV.     Appellant's Post-Trial Motion for Fees

Appellant complains that the court erred in denying his post-trial motion for fees under Code of Civil Procedure section 2033.420.

---

[14]     In reaching this conclusion, we reject respondent's argument he had the right to elect a remedy, and thus, that appellant could not seek an accounting because appellant terminated the partnership by wrongfully destroying it and converting the assets to his own use.  Appellant's actions which deprived respondent of the partnership assets occurred *after* the partnership had ended as a matter of law, i.e., after the purpose of the partnership had been completed—after the remodel and sale of the store.  Therefore, the cases cited by respondent, such as *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 564-566, which hold that the victim, (here respondent) has an election of remedies—to seek a dissolution of the partnership and accounting or submit to the repudiation and sue for damages—are inapplicable here.

## A.    Background

During discovery appellant propounded requests for admission.  One such request asked respondent to admit that he was not appellant's employee or an employee of the business.  Respondent denied the request.  Thereafter, throughout the litigation and most of the trial, respondent maintained that he was an "employee" of appellant.  However, at the end of the trial respondent stipulated that he and appellant were partners.  At the same time, respondent also amended his complaint, deleting all references to his alleged status as an employee and his cause of action for Labor Code violations based on claims that he was an employee.  Respondent also changed his theory of recovery to a breach of the partnership agreement and breach of fiduciary duties.

Thereafter, appellant sought fees under Code of Civil Procedure section 2033.420 because according to appellant, he proved respondent was not an employee when at the end of the trial, respondent "stipulated" that he was a "partner."  Appellant argued that as a matter of law, appellant was entitled to fees and expenses based on respondent's failure to admit that he was not an employee.  The trial court denied the appellant's motion, concluding that because respondent stipulated to the partnership before the issue was submitted to the jury, appellant did not actually "prove" the existence of the partnership to the trier of fact.

## B.    Analysis

Code of Civil Procedure section 2033.420 provides:

> "(a) If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

> "(b) The court shall make this order unless it finds any of the following:

23

"(1) An objection to the request was sustained or a response to it was waived . . . .

"(2) The admission sought was of no substantial importance.

"(3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter [or]

"(4) There was other good reason for the failure to admit."

Requests for admissions differ fundamentally from other forms of discovery. Rather than seeking to uncover information, they seek to eliminate the need for proof. (*Demyer v. Costa Mesa Mobile Home Estates* (1995) 36 Cal.App.4th 393, 401 [also observing that elimination of need for proof can be achieved by stipulation at any time before trial], disapproved of on other grounds in *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 983, fn. 12.)  The main purpose for requests for admission is to set triable issues to rest, so that they need not be tried.  They are aimed at expediting the trial.  (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509; *Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 865.)  The basis for imposing sanctions is directly related to that purpose.  (*Stull v. Sparrow*, *supra,* 92 Cal.App.4th at p. 865.)  Unlike other discovery sanctions, an award of expenses under section under section 2033.420 is not a penalty. Instead, it is designed to reimburse reasonable expenses incurred by a party in proving the truth of a requested admission when any trial would have been expedited or shortened if the request had been admitted.  (See *ibid.; Brooks v. American Broadcasting Co., supra,* 179 Cal.App.3d at p. 509; see also *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 634.)

In *Wagy v. Brown* (1994) 24 Cal.App.4th 1, the appellate court recognized this primary purpose of the sanctions provision in the predecessor section of Code of Civil Procedure section 2033.420, former Code of Civil Procedure section 2033.  In *Wagy* the plaintiffs had served a request that the defendants admit negligence in causing the automobile accident that was the subject of the litigation. The defendants refused to make

24

that admission. Nevertheless, before the arbitration began, the defendants admitted their negligence, thus ending the need for plaintiffs to submit any proof on that issue. Neither party requested a trial de novo and the arbitrator's award was entered as a judgment in favor of the plaintiffs. (*Wagy v. Brown, supra,* 24 Cal.App.4th at p. 4.) The court held that based on the definition of "proof" in Evidence Code section 190,[15] and the defendants' concession, the plaintiffs had not "proved" the truth of the matter contained in their request for admission as required for an award of expenses under former Code of Civil Procedure section 2033, subdivision (o). Rather, plaintiffs had merely prepared to submit proof on this issue. Therefore, they were not entitled to recover under former Code of Civil Procedure section 2033, subdivision (o). (*Wagy v. Brown, supra,* 24 Cal.App.4th at p. 6.)

In *Stull*, the defendants also admitted liability before trial, thus obviating the need for the plaintiff to produce any proof on that element of her case, and, in fact, plaintiff put on no evidence of liability. The appellate court concluded plaintiff was not entitled to an award of expenses under former Code of Civil Procedure section 2033, subdivision (o), noting that "[p]roof is something more than just evidence. It is the establishment of a fact in the mind of a judge or jury by way of evidence. [Citation.] Until a trier of fact is exposed to evidence and concludes that the evidence supports a position, it cannot be said that anything has been proved." (*Stull v. Sparrow Stull, supra,* 92 Cal.App.4th at pp. 865-866.) The reviewing court also noted that "[b]ecause proof was unnecessary and the purposes of [former Code of Civil Procedure] section 2033 were served, the trial court did not abuse its discretion in determining that [plaintiff] was not entitled to an order of costs and fees under [former Code of Civil Procedure] section 2033, subdivision (o) on the ground that the issue had not been proved."

In our view, the trial court erred in concluding that appellant did not "prove" the various facts which it had asked respondent to admit. In both *Wagy* or *Stull* – the two

---

[15]    "'Proof' is the establishment by evidence of a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid.Code, § 190.)

cases relied upon by the trial court here in denying the request for fees – the admission of liability by the defendants occurred *prior* to trial, so the plaintiffs were not required to submit proof on those matters during the trial. Unlike the situation in either *Wagy* or *Stull* the facts in question here (i.e. whether respondent was an employee or a partner) were actually litigated and appellant submitted proof on those matters to the jury during the trial. As noted above, a stipulation, presented to a jury, is a form of proof. (*Wagy v. Brown, supra*, 24 Cal.App.4th at p. 6.) In addition, allowing fees under Code of Civil Procedure section 2033.420 in this instance serves the purposes underlying the statute: to reimburse reasonable expenses incurred by a party in proving the truth of a requested admission when any trial would have been expedited or shortened if the request had been admitted. (*Stull v. Sparrow*, *supra,* 92 Cal.App.4th at p. 865.) Respondent's last minute stipulation did not obviate the need to present evidence to the jury or shorten the trial; appellant was required to present its proof to the jury that respondent did not have the status of an employee. Denying him those fees simply because the jury did not reach a verdict on this question, undermines the statute.

Before this court, respondent does not seek to specifically defend the court's rationale for denying the fee request, but instead he contends that the request was properly denied for another reason—that the admission that he was a "partner" did not prove he was not an employee. In other words the stipulation did not contradict the earlier denial of his employee status in the request for admission. Respondent points out that a person can be both a partner and an employee.

In theory, respondent is correct. However, the parties litigated this case as if respondent's employee status and partner status were mutually exclusive. Appellant defended against the Labor Code claims and the claim that respondent was an employee by proving that they were partners. Most significantly, when respondent stipulated he was a partner, he also amended his complaint, deleting his Labor Code violations cause of action and all of the allegations that he was an employee. Here in the unique context of this case, respondent was either an employee or a partner; he could not be both. He did not simultaneously seek redress for Labor Code violations as an employee and a

26

breach of fiduciary duty that existed based on the parties' partnership.  Thus by implication, his stipulation that he and appellant were partners was a tacit admission that he was not an employee.

In view of this analysis, we conclude the court erred in denying the post-judgment motion for fees under Code of Civil Procedure section 2033.420, and this matter must be remanded for further proceedings.  It appears that the trial court denied the motion based solely on Code of Civil Procedure section 2033.420, subdivision (a) of the statute and thus the court did not assess the possible application of any of the statutory exceptions contained in subdivision (b).  Consequently, on remand the court should consider whether an award of fees is appropriate in light Code of Civil Procedure section 2033.420, subdivision (b).

<em><strong>DISPOSITION</strong></em>

The judgment is reversed and the matter is remanded.  On remand, the trial court is directed to strike the award of emotional distress damages and punitive damages from the judgment.  In addition, in accord with the views expressed in this opinion, the court is directed to conduct further proceedings on appellant's cross-complaint for an accounting.

The post-judgment order is reversed and the matter remanded.  On remand the court is directed to conduct further proceedings on appellant's motion for fees pursuant to Code of Civil Procedure section 2033.420.

Appellant is entitled to costs on appeal.


**WOODS, Acting P. J.**

**We concur:**


**ZELON, J.**                                   **SEGAL, J.**[*]

_____

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.